810 F.2d 270
 258 U.S.App.D.C. 151, Bankr. L. Rep. P 71,618
 In re AUTO-TRAIN CORPORATION, INC., a Florida corporation,
a/k/a Railway Services Corporation.
Murray DRABKIN, Trustee of Auto-Train Corporation, a/k/a
Railway Service Corporation, Appellant,
v.
MIDLAND-ROSS CORPORATION.
 No. 85-5873.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 2, 1986.
Decided Jan. 30, 1987.
As Amended March 19, 1987.
 
 Appeal from the United States District Court for the District of Columbia (Civil Action No. 84-02353).
 Barry J. Dichter, New York City, for appellant. Abel Mattos, Washington, D.C., also entered an appearance for appellant.
 Marilyn Shea-Stonum, Cleveland, Ohio, of the Bar of the Supreme Court of Ohio, pro hac vice by special leave of Court, with whom Barbara B. Kacir and Melanie S. Tuttle, Cleveland, Ohio, were on brief for appellee.
 Before SILBERMAN and WILLIAMS, Circuit Judges, and JAMESON,* Senior District Judge.
 Opinion for the Court filed by Circuit Judge WILLIAMS.
 WILLIAMS, Circuit Judge:
 
 
 1
 This action involves a transfer of funds by Railway Services Corporation, a wholly owned subsidiary of Auto-Train Corporation, Inc., to Midland-Ross Corporation. Auto-Train's trustee in bankruptcy attacks the transfer as a voidable preference. See 11 U.S.C. Sec. 547 (1982). The principal issues addressed in this appeal are whether Railway ever possessed more than bare legal title to the funds and whether the Bankruptcy Court properly ordered Railway's retroactive consolidation into Auto-Train's estate in bankruptcy.
 
 BACKGROUND
 
 2
 The transaction underlying this litigation began in April 1980 when Ronald Wilson, an agent for Ronsco Supply Company, Inc., contacted Midland-Ross's National Castings Division to propose a possible sale by Midland-Ross of 100 railroad car sets (a type of railway equipment) to Marine Industries Ltd. Because Marine was a Canadian company, Ronsco, and possibly Midland-Ross, worried that restrictions in the patent licenses under which Midland-Ross manufactured car sets might prohibit a direct sale from Midland-Ross to Marine. Responding to these concerns Ronsco suggested using Railway as a middleman. The parties agreed and the transaction proceeded as set out below.
 
 
 3
 Ronsco, as Marine's agent, submitted a purchase order for the car sets to Railway. Railway in turn submitted its own purchase order to Midland-Ross, which filled the order by shipping the car sets directly to Marine in Canada. Upon receiving the car sets Marine transferred funds totaling $499,671.10 to Railway. These funds represented the $421,354.19 purchase price of the car sets (which Railway paid to Midland-Ross in a series of transfers over the period from June 11 to July 15, 1980), freight charges incurred in the transaction, Ronsco's commission and Railway's own $5,000 commission. The transaction worked to the satisfaction of all parties until it attracted the attention of Auto-Train's trustee in bankruptcy (the "Trustee") some two years later.
 
 
 4
 On September 8, 1980 Auto-Train filed a voluntary petition under Chapter 11 of the Bankruptcy Code and shortly thereafter the Trustee was appointed. The Trustee on November 10, 1980, filed a motion to amend the caption of the Auto-Train petition to add Railway as a name by which Auto-Train was also known and to consolidate the assets and liabilities of Railway into the Auto-Train estate. On November 21, the Bankruptcy Court conducted a hearing on the motion and issued an order consolidating Railway into Auto-Train's estate, effective nunc pro tunc as of September 8, 1980.
 
 
 5
 Armed with the nunc pro tunc consolidation order, which if effective would make September 8, 1980 the date of Railway's filing in bankruptcy, the Trustee brought a proceeding in bankruptcy court to recover the payments to Midland-Ross as preferential, since they had been made within 90 days of that date. Midland-Ross asserted that the Trustee could not void the transfer because, among other things, (a) Railway never possessed equitable title to the funds and (b) the Bankruptcy Court lacked the power to consolidate Railway into the Auto-Train estate nunc pro tunc. The Bankruptcy Court ruled against Midland-Ross on each of these issues and entered summary judgment in favor of the Trustee. Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.), No. 82-0287, mem. op. (Bankr.D.D.C. June 15, 1984). On appeal, the United States District Court for the District of Columbia concluded that, as a matter of law, the funds transferred to Midland-Ross were subject to a constructive trust in favor of Midland-Ross. In re Auto-Train Corp., 53 B.R. 990 (D.D.C.1985). Without reaching any of the other issues raised, the District Court remanded the case to the Bankruptcy Court for entry of summary judgment in favor of Midland-Ross. The Trustee appeals.
 
 THE ALLEGED CONSTRUCTIVE TRUST
 
 6
 When a debtor files a petition in bankruptcy, an estate is created comprising "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. Sec. 541(a)(1) (1982). The estate comprises no greater rights than the debtor had on the date of filing. Thus, where the debtor possesses only bare legal title to an asset, the estate holds that asset subject to the outstanding equitable interest. 11 U.S.C. Sec. 541(d) (1982).
 
 
 7
 Midland-Ross asserts that Railway never possessed more than bare legal title to the funds received from Marine because Railway had a duty, enforceable by constructive trust, to convey the funds to Midland-Ross. The issue must be determined under the laws of the state (or other local jurisdiction) having the dominant contacts with those funds. In re American Int'l Airways, Inc., 44 B.R. 143, 146 (Bankr.E.D.Pa.1984). That jurisdiction, the parties agree, is the District of Columbia.
 
 
 8
 Under District of Columbia law "[a] constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if permitted to retain it." Gray v. Gray, 412 A.2d 1208, 1210 (D.C.1980) (citations omitted); accord Hertz v. Klavan, 374 A.2d 871, 873 (D.C.1977); Osin v. Johnson, 243 F.2d 653, 656 (D.C.Cir.1957). Although District law imposes no specific limitations on the type of conduct that can justify the imposition of a constructive trust, it has found such trusts in non-commercial settings where the wrongdoer holds legal title to property by virtue of mistake, fraud, or breach of fiduciary duty. See Hertz v. Klavan, supra (constructive trust imposed where nephew duped 98-year-old widow into deeding him house); Gray v. Gray, supra (constructive trust imposed to effect decedent's intent that house go to all her children and not only to sibling named as joint tenant on deed).
 
 
 9
 Here, Midland-Ross claims that Railway would have been unjustly enriched if it were allowed to treat the funds received from Marine as its own; after all, it, not Railway, provided the car sets that generated the funds. The argument ignores Midland-Ross's legal claim against Railway for the price. Railway's legal indebtedness obviated any unjust enrichment problem and thus any need for equity to create a constructive trust. See McKee v. Paradise, 299 U.S. 119, 121-23, 57 S.Ct. 124, 124-25, 81 L.Ed. 75 (1936).
 
 
 10
 In a very limited number of cases involving what would normally be considered a debtor-creditor relation, courts have found specific funds subject to a trust in favor of a creditor. In many of these cases the trust is imposed by virtue of a state statute designed to provide additional protection to certain types of creditors, usually contractors. See, e.g., Selby v. Ford Motor Co., 590 F.2d 642, 647 (6th Cir.1979); Carrier Corp. v. J.E. Schecter Corp., 347 F.2d 153, 155 (2d Cir.1965), cert. denied, 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965). In cases not involving such a statute, the courts have uniformly required a contract irrevocably obligating the debtor both to segregate the "trust funds" from the debtor's own funds and to deliver the "trust funds" to the creditor.[1] See, e.g., In re Morales Travel Agency, 667 F.2d 1069, 1071 (1st Cir.1981); Mid-Atlantic Supply, Inc. v. Three Rivers Aluminum Co., 790 F.2d 1121, 1126-27 (4th Cir.1986); Georgia Pacific Corp. v. Sigma Service Corp., 712 F.2d 962, 971-72 (5th Cir.1983).[2] The agreement between Midland-Ross and Railway fails to impose these duties and establishes nothing more than a generic debtor-creditor relationship.
 
 
 11
 Every document passing between Railway and Midland-Ross is cast in terms of a standard buy-sell arrangement. Railway sent purchase orders to Midland-Ross which Midland-Ross satisfied by shipping the car sets, addressed to Railway, to Marine's plant in Canada.[3] In turn, Midland-Ross billed Railway by invoices identifying Railway as the purchaser. Even Midland-Ross's own internal documentation identifies Railway as the customer.
 
 
 12
 Midland-Ross argues, however, that the documentation of the transaction does not accurately reflect the substance of its agreement with Railway. As evidence of the "true substance" of its agreement with Railway, Midland-Ross directs our attention to Railway's special Side Frames and Bolsters Account (the "Special Account"), through which flowed most of the funds involved in the transaction.
 
 
 13
 The Special Account was in essence the residue of a proposal that the parties ultimately dropped. Midland-Ross initially demanded to be paid in advance. Because of Railway's lack of credit this demand could be accommodated only if Marine paid Railway in advance. In order to make this proposition more palatable to Marine, Railway opened the Special Account, and sent a letter to its bank outlining a proposal for its use. Marine would transfer funds directly into the Special Account, and Railway's bank would control all disbursements from the Special Account to ensure that the money was used for the intended purposes. Railway sent a copy of this letter to Marine but not to Midland-Ross. But the proposal came to nothing. The bank never agreed to exercise control over the Special Account; Marine refused to pay cash in advance and Midland-Ross acquiesced. Although Railway kept the Special Account in existence, it was only a vestige of an abandoned scheme.[4]
 
 
 14
 As things worked out, Railway used the Special Account rather randomly, and not as the exclusive channel for receipts and disbursements relating to the transaction. Marine received the car sets in four lots and made four payments to Railway. Of these, the first (approximately $177,000) went originally to Railway's general account; later Railway transferred a part (approximately $133,000) to the Special Account. Upon receiving each of the remaining three shipments, Marine transferred funds totaling approximately $366,000 into the Special Account. Rather than paying Midland-Ross immediately upon receiving a transfer from Marine, Railway delayed and used the funds for other purposes, transferring some $80,000 from the Special Account to its (or Auto-Train's) general account. While Railway ultimately satisfied its obligation to Midland-Ross with transfers out of the Special Account, it was able to do so only by replenishing the Special Account with its general funds. These facts hardly support the conclusion that Railway was bound to hold the funds it received from Marine in trust for Midland-Ross.
 
 
 15
 Thus both the documents and Railway's behavior reflect the lack of any agreement compelling Railway to segregate the funds and ensure their transmittal to Midland-Ross. The requirements of a constructive trust in this setting may seem formalistic. But it is entirely appropriate to insist on their full rigor, since constructive trust doctrine creates a mechanism by which a creditor may attain a position roughly equivalent to a perfected security interest in proceeds without complying with the usual statutory formalities, see D.C.Code Ann. Sec. 28:9-306 (Supp.1986), and thus tends to undercut the statutory scheme. In any event, we find that Midland-Ross failed to take the formal steps necessary to meet its burden of establishing a constructive trust and has therefore not taken itself out of conventional creditor status.
 
 THE NUNC PRO TUNC ORDER
 Validity
 
 16
 Railway's payments to Midland-Ross took place between June 11 and July 25, 1980. In order to recover these transfers as preferences, the Trustee must show they were made on or within 90 days before the date Railway filed its petition in bankruptcy. 11 U.S.C. Sec. 547(b)(4)(A) (1982). Thus he must establish that Railway filed for bankruptcy no later than September 9, 1980. The Trustee attempts to reach that result via the nunc pro tunc order, making Auto-Train's filing in bankruptcy the legal date of Railway's filing.
 
 
 17
 Courts have stated somewhat divergent rules concerning the entry of orders nunc pro tunc. Some have said they are allowable only to make the record reflect something that actually happened but was not recorded, e.g., Crosby v. Mills, 413 F.2d 1273, 1277 (10th Cir.1969); Powell v. Blevins, 365 S.W.2d 104, 106 (Ky.1963), some that they may be entered to achieve equity even though so doing supplies an action that did not occur on the earlier date, e.g., In re Triangle Chemicals, Inc., 697 F.2d 1280, 1288-89 (5th Cir.1983) (permitting lower court to enter order appointing attorney as counsel to estate nunc pro tunc as of date attorney began working, in order to allow him to be paid for efforts prior to appointment). But even courts taking the broader view have only granted such orders under extraordinary circumstances where they will not prejudice any party or frustrate the purposes of the Bankruptcy Code. See id. at 1286-89.
 
 
 18
 The Trustee asserts that the nunc pro tunc consolidation order merely caused the record to reflect a fact that already existed, namely that Railway had no existence separate from that of Auto-Train.[5] We believe, however, that even if the Bankruptcy Court's findings on this issue suffice for purposes of consolidation, they do not justify putting a nunc pro tunc spin on the order. Here, in fact, we believe that the nunc pro tunc feature prejudices Midland-Ross in a manner contrary to the purposes of the Bankruptcy Code.
 
 
 19
 We assume, arguendo, that consolidation was proper. Although the Bankruptcy Code nowhere specifically authorizes consolidation of separate estates,[6] courts may order consolidation by virtue of their general equitable powers. E.g., In re Continental Vending Machine Corp., 517 F.2d 997, 1000 (2d Cir.1975), cert. denied, 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317 (1976). When they do so, it is typically to avoid the expense or difficulty of sorting out the debtor's records to determine the separate assets and liabilities of each affiliated entity. See Chemical Bank New York Trust Co. v. Kheel, 369 F.2d 845, 847 (2d Cir.1966). However, because every entity is likely to have a different debt-to-asset ratio, consolidation almost invariably redistributes wealth among the creditors of the various entities. This problem is compounded by the fact that liabilities of consolidated entities inter se are extinguished by the consolidation. See Flora Mir Candy Corp. v. R.S. Dickson & Co., 432 F.2d 1060, 1063 (2d Cir.1970).
 
 
 20
 Before ordering consolidation, a court must conduct a searching inquiry to ensure that consolidation yields benefits offsetting the harm it inflicts on objecting parties. See, e.g., In re Snider Bros., Inc., 18 B.R. 230, 237-38 (Bankr.D.Mass.1982). The proponent must show not only a substantial identity between the entities to be consolidated, but also that consolidation is necessary to avoid some harm or to realize some benefit. Id.; see also Flora Mir Candy Corp. v. R.S. Dickson & Co., 432 F.2d at 1063; Chemical Bank New York Trust Co. v. Kheel, 369 F.2d at 847. At this point, a creditor may object on the grounds that it relied on the separate credit of one of the entities and that it will be prejudiced by the consolidation. See Chemical Bank New York Trust Co. v. Kheel, 369 F.2d at 848 (Friendly, J., concurring). If a creditor makes such a showing, the court may order consolidation only if it determines that the demonstrated benefits of consolidation "heavily" outweigh the harm. In re Continental Vending Machines Corp., 517 F.2d at 1001.
 
 
 21
 It appears to us that a bankruptcy court must undertake an additional and slightly different balancing process before using its equitable nunc pro tunc powers to give a consolidation order retroactive effect. Here the problem is the impact of a rule exposing possible preference recipients to the risk of unpredictable shifts in the date that determines the legitimacy of transfers. Although the Bankruptcy Code clearly compels certain transferees to restore to their debtor property received within 90 days of the date their debtor files a petition in bankruptcy, it would thwart the Code's policies to require transferees to disgorge solely on the basis of a bankruptcy filing by their debtor's apparently distinct affiliate.
 
 
 22
 The policies of the Bankruptcy Code are twofold:
 
 
 23
 First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter 'the race of diligence' of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section--that of equality of distribution.
 
 
 24
 H.R.Rep. No. 595, 95th Cong., 1st Sess. 177-78, reprinted in 1978 U.S.Code & Admin.News 5787, 6138. While the impact on equality among creditors is ambiguous, it is clear that allowing nunc pro tunc consolidation in cases such as the present one would disastrously accelerate the race among creditors.
 
 
 25
 Were bankruptcy courts permitted to consolidate entities nunc pro tunc without regard to transferees' reliance on an entity's apparent separateness, a sign of weakness in any member of a family of corporations would lead creditors to descend on each member, strong or weak, to claim their pound of flesh. Such a rule would also sharpen people's natural reluctance to extend credit to any affiliate of a financially troubled corporation. This in turn would imperil the ability of financially sound affiliates to continue operations and help the more troubled ones out of their predicament.[7]
 
 
 26
 In light of these considerations, a court should enter a consolidation order nunc pro tunc only when it is satisfied that the use of nunc pro tunc yields benefits greater than the harm it inflicts. This inquiry will closely parallel that conducted with respect to consolidation. Because the consolidation proceeding will already have established a substantial identity between the entities to be consolidated, this inquiry begins with the proponent of nunc pro tunc making a showing that nunc pro tunc is necessary to achieve some benefit or avoid some harm. Following this showing, a potential preference holder may challenge the nunc pro tunc entry of the consolidation order by establishing that it relied on the separate credit of one of the entities to be consolidated and that it will be harmed by the shift in filing dates. If a potential preference holder meets this burden, the court must then determine whether the benefits of nunc pro tunc outweigh its detriments.[8]
 
 
 27
 Applying this standard to the instant case, we are convinced that the Bankruptcy Court erred in consolidating Railway into Auto-Train's estate nunc pro tunc. In subjecting Midland-Ross to a preference period based on Auto-Train's filing date, the Bankruptcy Court focused exclusively on the inner relationship between Railway and Auto-Train and gave little or no weight to Midland-Ross's reliance on the separate credit of Railway.[9] While it may be true that Auto-Train and Railway operated internally as one entity, this bears little on the issue of Midland-Ross's reliance on Railway's apparent separateness. Far more probative is the overwhelming evidence that Railway and Auto-Train continually maintained the appearance of separate corporations in the public's eye. Railway filed an S-1 registration statement with the Securities and Exchange Commission indicating that Railway's assets, liabilities and operations were separate from those of Auto-Train. An employee of Railway testified that Railway dealt with the public as an entity independent of Auto-Train. Midland-Ross's reliance on these manifestations is evidenced by its extension of credit to Railway after Auto-Train filed its petition in bankruptcy. See Midland-Ross Appendix at 238. Ignoring this strong evidence of Midland-Ross's reliance on the separate credit of Railway, the Bankruptcy Court, relying on an ambiguous memorandum, concluded that nunc pro tunc consolidation would not unjustly prejudice Midland-Ross.[10] Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.), No. 82-0287, mem. op. at 33 & n. 10.
 
 
 28
 Against Midland-Ross's reliance on the separate credit of Railway, the Trustee asserts only a concern for the cost of disentangling the corporate books. But under our judgment no such disentanglement is required: merely a reversal of the nunc pro tunc feature of the consolidation order, with a return of such preferences as have been based upon use of the September 8 date, and even then only to recipients who resisted the claim as did Midland-Ross. Accordingly we hold the nunc pro tunc nature of the consolidation improper.
 
 Collateral Attack
 
 29
 The Trustee argues that Midland-Ross's failure to promptly appeal from the nunc pro tunc consolidation order bars it from collaterally attacking any aspect of that order.[11] Essentially the Trustee argues that the consolidation proceeding is res judicata as to Midland-Ross. Res judicata, however, can constitutionally bar only persons that have had notice and an opportunity to be heard. Montgomery v. Samory, 99 U.S. (9 Otto) 482, 488, 25 L.Ed. 375 (1878); see Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S.Ct. 2965, 2975, 86 L.Ed.2d 628 (1985). Because we find that Midland-Ross was not given adequate notice of the consolidation hearing, we hold that it is not barred from attacking the nunc pro tunc consolidation order.
 
 
 30
 Nowhere does the Bankruptcy Code explicitly specify the notice that a trustee must give of the type hearing here at issue. See Bankruptcy Rule 2002. Therefore Bankruptcy Rule 9014 applies, see In re 1438 Meridian Place, N.W., Inc., 15 B.R. 89, 94-95 (Bankr.D.D.C.1981), requiring that "reasonable notice and opportunity for hearing ... be afforded the party against whom relief is sought." Bankruptcy Rule 9014. This standard closely parallels the constitutional minimum, articulated in Mullane v. Central Hanover Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), requiring that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Id. at 314, 70 S.Ct. at 657.
 
 
 31
 This requirement breaks down into two elements. First, the notice must be given in such a manner that it is reasonably likely to reach its intended audience. Second, the content of the notice must reasonably inform the recipient of the nature of the upcoming proceeding. See id.; Mendoza v. United States, 623 F.2d 1338, 1350-52 (9th Cir.1980), cert. denied, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). Failure to meet either element renders the notice defective. Because we find the content of the Trustee's notice wanting we inquire no further.[12]
 
 
 32
 The notice given in this case revealed only that the hearing could result in an amendment of the caption of the Auto-Train bankruptcy petition to "Auto-Train Corporation, ... also known as Railway Services Corporation ... a wholly owned subsidiary," and that the assets and liabilities of Railway might be administered as part of and consolidated with the Auto-Train bankruptcy proceeding. Midland-Ross Appendix at 136. The Trustee asserts that this notice adequately conveys the fact that the hearing was likely to result in a retroactive consolidation because "relation back was [a] necessary corollary to amendment of the caption and consolidation." Reply Brief at 33. Similarly, the Bankruptcy Court held the content of the notice adequate because "[a] party on notice who was sufficiently interested in the matter to consult with counsel knowledgeable about bankruptcy proceedings would have received advice from such counsel as to exactly what was being sought." Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.), No. 82-0287, mem. op. at 32. We disagree.
 
 
 33
 As the Eighth Circuit Court of Appeals stated in addressing the adequacy of notice of a hearing to review the compromise of a class action,
 
 
 34
 [d]ue process requires that notice of a hearing ... be structured in terms of content in a manner that enables class members rationally to decide whether they should intervene ... or otherwise make their views known, and if they choose to become actively involved, to have sufficient opportunity to prepare their position.
 
 
 35
 Reynolds v. National Football League, 584 F.2d 280, 285 (8th Cir.1978); accord Marshall v. Holiday Magic, Inc., 550 F.2d 1173, 1177 (9th Cir.1977) ("Notice in a class suit must present a fair recital of the subject matter and proposed terms...."); see Manual for Complex Litigation, Second, Sec. 30.21 at 220-21 (1985) ("The notice [of class certification] should be accurate, balanced in tone, and understandable by the typical member of the class.").
 
 
 36
 Whether notice presents a fair recital of the proposed action is somewhat a function of its method of delivery. A person is far more likely to consult an attorney when he receives personal notice in the mail than when he happens upon a blurb in a newspaper directed to a broad class. Thus where notice is given solely by publication, its content cannot be considered adequate solely because an attorney can discern its meaning.
 
 
 37
 The content of the Trustee's notice falls well below that necessary to fairly recite the drastic nature of the relief requested by the Trustee. As this action appears to be the first reported case of a nunc pro tunc consolidation,[13] the retroactive effect sought and obtained by the Trustee was surely not a "necessary corollary" of the action noticed. The obscurity of the notice is compounded by the special circumstances: a party whose attorney divined the possibility would be forced to choose between challenging the nunc pro tunc feature, at the price of alerting the Trustee to the possible preference claim, and letting it pass. Such a dilemma may not be imposed without considerably greater clarity than was afforded here. Because the Trustee's notice was inadequate to apprise the typical prospective party in interest that the consolidation sought was to be given retroactive effect, we hold that Midland-Ross is not barred from objecting to the nunc pro tunc feature of the consolidation order.[14]
 
 
 38
 The case is remanded to the Bankruptcy Court for entry of summary judgment in favor of Midland-Ross in accordance with this opinion.
 
 
 39
 So ordered.
 
 
 
 *
 Of the United States District Court for the District of Montana, sitting by designation pursuant to 28 U.S.C. Sec. 294(d) (1982)
 
 
 [1]
 This is true irrespective of whether the analysis is conducted under the rubric of express trust or constructive trust
 
 
 [2]
 But cf. South Central Livestock v. Security State Bank, 614 F.2d 1056 (5th Cir.1980). In South Central, a cattle feedlot operation maintained a special account for the purpose of segregating cattle sales proceeds "belonging" to the cattle's owners from the feedlot's general funds. As the feedlot descended toward bankruptcy, the bank offset certain obligations against the special account. In litigation between the cattle owners and the bank (the trustee of the feedlot evidently not even appearing in the lawsuit), the court found that the offset was improper. That the funds belonged to the cattle owners appears to have been assumed by all participants; the court was concerned largely with the bank's awareness of that ownership. 614 F.2d at 1059-60. To the extent South Central stands for the proposition that a constructive trust can arise absent an irrevocable agreement compelling the debtor to use the funds exclusively for the creditor's benefit, it appears to conflict with the subsequent Fifth Circuit decision in Georgia Pacific Corp. v. Sigma Service Corp., 712 F.2d 962 (5th Cir.1983)
 
 
 [3]
 The practice of a supplier shipping goods directly to the ultimate customer is not uncommon in a purchase for resale
 
 
 [4]
 The record is unclear as to exactly when Railway opened this account. The salient fact is that the account had its genesis when Midland-Ross demanded cash in advance
 
 
 [5]
 Alternatively, the Trustee submits that the practical difficulties of administering consolidated estates having different preference periods compel us to adopt the more expansive view of nunc pro tunc orders. However, as we develop below, the nunc pro tunc order would thwart the policies underlying the Code's preference provisions; this adverse effect clearly overwhelms any benefits from eliminating the difference in preference periods. Accordingly, even on the expansive view of the role of a nunc pro tunc order, we find it unjustifiable in the present case
 
 
 [6]
 Compare 11 U.S.C. Sec. 302(b) (1982) (directing bankruptcy courts to consider feasibility of consolidating joint estates in bankruptcy)
 
 
 [7]
 We note that Midland-Ross extended credit to Railway even after Auto-Train filed for bankruptcy. Moreover, in addition to generating a $5,000 commission for Railway, the transaction at issue placed substantial funds at Railway's disposal, some of which Railway made available to Auto-Train. See supra p. 275
 
 
 [8]
 Requiring a bankruptcy court to consider potential preference holders' legitimate reliance on the separate credit of one entity does not conflict with the lower court cases that have considered related situations. Evans Temple Church of God in Christ and Community Center, Inc. v. Carnegie Body Co., 55 B.R. 976 (Bankr.N.D.Ohio 1986) (consolidated estates each permitted to rely on earliest filing date where creditors themselves could not distinguish between debtors consolidated); In re Crabtree, 39 B.R. 718 (Bankr.E.D.Tenn.1984) (creditors' motion for nunc pro tunc consolidation granted over debtor's objections)
 
 
 [9]
 For example, it noted that "[s]ignificantly, Midland-Ross has submitted no evidence that even suggests that Railway was not at all times the alter ego and instrumentality of Auto-Train." Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.), No. 82-0287, mem. op. at 31 (emphasis in original)
 
 
 [10]
 This memorandum, as well as other of Midland-Ross's internal documents, can reasonably be interpreted as supporting Midland-Ross's position
 
 
 [11]
 The Trustee also asserts that laches bars Midland-Ross from attacking the consolidation order some two years after its issuance. Laches only applies where a party fails to raise a claim diligently. E.g., Gull Airborne Instruments, Inc. v. Weinberger, 694 F.2d 838, 843 (D.C.Cir.1982). Irrespective of when Midland-Ross learned of the order's nunc pro tunc effect, we do not believe that Midland-Ross was slothful in waiting to attack the nunc pro tunc nature of the consolidation order until the Trustee sued to recover the funds as preferential. Until then, the nunc pro tunc nature of the order caused Midland-Ross no harm. We decline to rule that the doctrine of laches required Midland-Ross to flag the possible preference by initiating a challenge before the Trustee even hinted at any intent to assert one
 
 
 [12]
 It is undisputed that the only notice the Trustee gave anyone of the hearing was a one-time publication in the Washington Law Reporter, Washington Star, Virginia Pilot, and the Orlando Sentinal Star. The record reflects that Midland-Ross never had actual notice of the consolidation proceedings. E.g., Trustee Appendix at 228, 229; Midland-Ross Appendix at 237, 238, 339-41
 
 
 [13]
 The cases cited supra at 14 n. 8 all occurred after the Bankruptcy Court's decision in this case
 
 
 [14]
 Our holding here is quite consistent with Southern Industrial Banking Corp. v. Anderson, 66 B.R. 349, 359-361 (Bankr.E.D.Tenn.1986). That case holds that the word "creditors," as used in the notice provisions of Bankruptcy Rules 2002(b) and 3017(d), does not encompass holders of possible preferences who may later be transformed into creditors by successful assertion of a preference theory, and indeed finds that any such view would be inconsistent with the structure of the Bankruptcy Code. Southern Industrial Banking Corp. explicitly leaves open whether there might be circumstances where lack of notice of particular bankruptcy proceedings would constitutionally bar successful assertion of a preference. See id. at 359 n. 14, 361