**In re GC COMPANIES, INC.,
et al., Debtors.**

**Nos. 00–3897(EIK) to 00–3927(EIK).**

United States Bankruptcy Court,
D. Delaware.

March 18, 2002.

Daniel M. Glosband, Richard A. Oetheimer, Colleen Murphy, Goodwin Procter LLP, Boston, MA, David M. Fournier, Pepper Hamilton LLP, Wilmington, DE, Counsel for Debtors & Debtors in Possession.

Marc A. Beilinson, Jeremy V. Richards, Peter J. Duhig, Pachulski, Stang, Ziehl, Young & Jones P.C., Los Angeles, CA, Counsel to the Official Committee of Unsecured Creditors.

Joseph J. McMahon, Jr., Office of the United States Trustee, Wilmington, DE, Richard L. Schepacarter, Office of the United States Trustee, Newark, NJ, for Donald F. Walton, Acting United States Trustee for Region Three.

## MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.[1]

This matter comes before the Court for hearing on confirmation of the First

---

**1.** Bankruptcy Judge for the Northern District of Illinois, sitting by special designation in the District of Delaware through inter-circuit loan.

Amended Joint Plan of Reorganization and the objection of Donald F. Walton, Acting United States Trustee for Region Three (the "U.S. Trustee") to confirmation of the First Amended Joint Plan of Reorganization of Debtors and the Official Committee of Unsecured Creditors (the "Plan"). The U.S. Trustee objects on the basis that (1) the Plan provision providing for substantive consolidation *nunc pro tunc* to the date of filing is inappropriate and (2) the plan does not satisfy 11 U.S.C. § 1129(a)(12) as it does not adequately provide for the payment of quarterly fees to the office of the U.S. Trustee under 28 U.S.C. § 1930(a)(6).[2] The second objection raises the question of what constitutes a "disbursement" for purposes of calculating fees under § 1930(a)(6).

For the reasons set forth herein, the Court holds that (1) the *nunc pro tunc* relief is denied, (2) substantive consolidation is allowed and (3) a "disbursement" for the purposes of 28 U.S.C. § 1930(a)(6) is any amount paid for an obligation of a debtor, regardless of the entity making the payment. Confirmation is granted on the conditions that (1) the *nunc pro tunc* relief is stricken from the plan (2) Debtors file their individual monthly operating reports and supporting documentation, as required by the U.S. Trustee, on or before April 15, 2002 and (3) an appropriate reserve for U.S. Trustee fees is made, as set forth in the Plan.

## FINDINGS OF FACTS

GC Companies, Inc. ("GCX") is the parent company of General Cinema Theaters, Inc. ("GCT"). GCT owns a number of debtor subsidiaries that in turn own and operate one or more movie theaters. Prior to the petition date Debtors were operating 133 theaters with 1,070 screens in 24 states. There are a total of 31 jointly administered Debtors in this case.

The following relevant facts were stipulated to by the Debtors, the Official Committee of Unsecured Creditors (together, the "Proponents") and the U.S. Trustee or were presented through evidence.

1. GCX is a company that owns one hundred percent (100%) of the common stock of its Debtor subsidiaries, GCT and GCC Investments, Inc. ("GCCI").

2. GCCI was and is an entity which makes investments in third parties. GCCI records revenue only through its investments.

3. GCT is a company that owns one hundred percent (100%) of the common stock of the remaining Debtor subsidiaries (individually a "Debtor Operating Subsidiary"; collectively, the "Debtor Operating Subsidiaries"), each of which own one or more Theater Units (theater locations.)

4. GCX, GCT and the Debtor Operating Subsidiaries are engaged in the theatrical exhibition of motion pictures.

5. All financing, computing and management information systems services, accounting, film and concessions purchasing, payroll and related functions, insurance and risk management, legal functions and executive functions are performed for the Debtor Operating Subsidiaries by the Corporate Office.

6. The only audited financial statements that the Debtors provide to third parties or report publicly are consolidated financial statements ex-

---

**2.** The U.S. Trustee's written objection to Plan confirmation also included objections which were resolved prior to the confirmation hearing or addressed at the hearing. No discussion of these matters is necessary here.

cept that through October, 1999, the Debtors generated audited, consolidated annual financial statements for GCT.

7. The Debtors maintain twelve accounts with various banks as depository accounts for cash receipts (the "Local Depository Accounts").

8. The Local Depository Accounts are held in the name of some, but not all of the Debtor Operating Subsidiaries.

9. Each of the Local Depository Accounts receives deposits from multiple Theater Units and some receive deposits from Theater Units owned by more than one of the Debtor Operating Subsidiaries.

10. Each business day, cash receipts from operations are deposited into the Local Depository Accounts and, on a daily basis, the balances in these accounts are transferred to a concentration account maintained in the name of GCT (the "GCT Concentration Account"). Credit card receipts are deposited directly into the GCT Concentration Account.

11. Daily, all funds in the GCT Concentration Account are transferred to a Concentration Account held in the name of GCX (the "GCX Concentration Account"), where they are swept, on a daily basis, by the Debtors' cash management bank. On a weekly basis, cash receipts from national ticket sales are transferred to the GCX Concentration Account.

12. Each business day, the GCX Treasury Services Department draws sufficient funds from the GCX Concentration Account to cover checks to be honored that day, and electronically transfers that amount to the GCX Master Funding Account in order to fund the GCX Disbursing Accounts. In the event of an insufficiency of funds, the GCX Treasury Services Department draws sufficient funds from GCX's working capital line (described below) for deposit into the GCX Master Funding Account.

13. On or about October 11, 2000, the Debtors sought approval of their First Day Motions, including Debtors' Motion for Order Authorizing Continuation of Debtors' Existing Cash Management System ("Cash Management Motion").

14. In the Cash Management Motion, the Debtors represent, acknowledge and admit that (a) the purpose for continuing the Cash Management System is that it provides significant benefits to the Debtors including the ability to control corporate funds, to ensure availability of goods and funds to particular entities when necessary, and reduce interest expense by enabling the Debtors to utilize all funds within the system rather than relying upon short term borrowings from third parties to fund their cash requirements and (b) that in order to ensure that the rights of their respective creditor constituencies are preserved, the Debtors will continue to maintain records with respect to all transfers of cash so that all inter-company transactions will be adequately documented and readily ascertainable.

15. On October 13, 2000, the Bankruptcy Court entered an Order approving the Cash Management System ("Cash Management Order"). The Cash Management Order directed the Debtors to maintain records of

all transfers within the Cash Management System in order that all post-petition receipts, transfers, disbursements and other transactions shall be adequately and promptly documented in, and readily ascertainable from, its books and records, to the same extent maintained by the Debtors prior to commencement of the Chapter 11 cases.

16. All check payments on account of the Debtors' operations are made by check or "automated clearing house" ("ACH") from various bank accounts (including a payroll account) maintained by GCX in its name at Fleet Bank. All of those accounts are funded from a master funding account (the "GCX Master Funding Account"), which is also maintained in the name of GCX.

17. There are no checking accounts in the name of any Debtor entity other than GCX and all checks are drawn on an account held by GCX and bear the name "General Cinema Theaters".

18. The use of certain products (such as Coca–Cola) at each Theater Unit is accounted for as an intercompany transaction between the Theater Unit and GCX or GCT; GCX pays the invoice for such product.

19. When GCX writes checks for certain products used at the theater level (such as Coca–Cola), the amount of that check that applied to a particular Theater Unit would be recorded to that unit as an expense.

20. Certain expenses related to the operations of individual Theater Units are coded within the accounts payable portion of the Debtors' cash management system.

21. Under the cash management section of the Debtors' "policies and procedures" manual, the Theater Units are authorized to make payments from theater operating funds in an amount not to exceed $150 except in the case of emergencies.

22. Prior to the Petition Date, the Debtors partially funded their theater operations through a revolving credit facility (the "Prepetition Bank Credit Facility") with a syndicate of banks (the "Banks"). GCX was the principal obligor under the Prepetition Bank Credit Facility and GCT and certain of the Debtor Operating Subsidiaries were guarantors.

23. The obligations of the Debtors under the Prepetition Bank Credit Facility were indirectly secured, by virtue of an Intercreditor Agreement between the Banks and Harcourt, by a pledge of one hundred percent (100%) of the issued and outstanding stock of GCT and all of the Debtor Operating Subsidiaries.

24. In order to fund the construction of new theaters and purchase new theater equipment, in mid 1997 GCT entered into that certain Master Lease Agreement (the "Master Lease Agreement") with GECC, for itself and as agent for its participants (collectively, "GECC"). The Master Lease Agreement required that GCT, as agent for GECC, acquire and initially fund the purchase of assets subject to the Master Lease Agreement. GECC would then reimburse GCT for those leased assets. GCT typically subleased its obligations and rights under the Master Lease Agreement with respect to each particular property to the appropriate

Debtor Operating Subsidiary (without a release of GCT's obligations), which Debtor Operating Subsidiary would assume GCT's obligations (a "Master Sublease Agreement"). GCX guaranteed the obligations of GCT under the Master Lease Agreement as well as the obligations of the Debtor Operating Subsidiaries under the Master Sublease Agreements.

25. From and after the Petition Date, the Debtors' operations have been funded pursuant to that certain Debtor in Possession Credit Agreement (the "DIP Agreement"), with GECC, as administrative agent, and other parties (collectively, the "DIP Lenders"), which provides revolving financing of up to $45 million.

26. GCX is the principal obligor under the DIP Facility Agreement, which is guaranteed by all of the other Debtors. The DIP Facility Agreement is secured by a second priority lien in and to substantially all of the assets of all of the Debtors and constitutes a superpriority administrative claim against all of the Debtors.

27. The Debtors have approximately 3,500 full and part-time employees system wide, of which approximately 85–90 employees are employed in the Boston Corporate Office.

28. All employees are paid with payroll checks drawn on the GCX payroll account.

29. All of General Cinema's employee policies and procedures manuals are issued to employees by GCX and GCT.

30. All employee benefits (including health, dental, disability, insurance and pension) are contracted and paid for by GCX.

31. Except for three senior executives (who have agreements with GCX), none of the employees have written employment agreements or contracts.

32. Although the Debtors contract with the studios on a screen by screen basis for motion picture product, all film product agreements are negotiated exclusively by the Debtors' film purchasing employees located at the Corporate Office and All studio invoices are billed to GCX, GCT or "General Cinemas" directly at the Corporate Office.

33. Third-party invoicing is generally invoiced to GCX or GCT.

34. The Debtors maintain inter-company accounts between GCX or GCT and individual Theater Units.

35. The inter-company accounts track: (a) the movement of cash between GCX, GCT and the Theater Units; and (b) the allocation of certain Theater Unit related revenues, costs and expenses between GCX, GCT and the Theater Units.

36. There are no management or operating agreements by and between any of the Debtors.

37. The expenses for capital expenditures are paid for by GCX, and the Theater Unit would have a corresponding intercompany entry to GCX in the amount of the cash advanced for the capital improvement. The capital improvement is booked at the unit level as a fixed asset entry.

38. The Debtors have the ability to generate reports summarizing inter-company balances by legal entity for different effective dates consistent with their fiscal calendar.

39. The Debtors' business is marketed and advertised under the name "General Cinemas" or "GC Companies" and has adopted a uniform "GCC" logo.

40. The Debtors' VIP and Corporate Program, which allows for the sale of discounted tickets to organized groups, is managed and maintained system wide by the Corporate Office under the name and style "General Cinemas".

41. Tickets issued pursuant to the Debtors' VIP and Corporate Program may be redeemed at any Theater Unit; the revenue relating to the redemption of such tickets is booked at the Theater units where the ticket is redeemed.

42. The Debtors filed their chapter 11 petitions on October 11, 2000.

43. Throughout these cases, the Debtors have consistently filed consolidated Monthly Operating Reports ("MORs").

44. The U.S. Trustee calculated the quarterly fees owed by the Debtors by taking certain expenses shown by each of the Debtors on their consolidated 1998 federal tax returns, calculating the percentage of such expenses for each Debtor as compared to the expenses for all of the Debtors in the same period (fiscal year end October, 1999), and applying those percentages, on a Debtor by Debtor basis, to the Debtors' total cash disbursements, as reported in their filed, consolidated MORs.

45. The U.S. Trustee contends that the quarterly fees owed by the Debtors as of December, 2001 (calculated in accordance with the methodology set forth in the June 7 Schedules) is approximately $753,000.

46. As part of their obligations as Debtors–In–Possession, the Debtors provided the UST with their Federal Tax Returns filed for the 1998 and 1999 tax years ("Tax Returns").

47. Section 16.1 of the Plan provides that:

All quarterly fees due and payable to the Office of the United States Trustee pursuant to section 1930(a)(6) of title 28 of the United States Code shall be paid in full on or before the Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have been established and set aside for payment in full thereof, as required by section 1129(a)(12) of the Bankruptcy Code.

Section 16.1 of the Plan (emphasis added).

## CONCLUSIONS OF LAW

Before this Court is the confirmation of Debtors' First Amended Joint Plan of Reorganization and the unresolved matters objected to by the U.S. Trustee. The U.S. Trustee argues that the Court should deny confirmation for the following reasons: 1) that Section 7.6 of the Plan, which provides for substantive consolidation *nunc pro tunc* to the date of filing, is inappropriate and substantive consolidation without any retroactive effect inappropriate and 2) that the Debtors did not file appropriate MORs for each Debtor, so the plan does not adequately provide for the payment of quarterly fees under 28 U.S.C. § 1930(a)(6) as required by 11 U.S.C. § 1129(a)(12) for confirmation of a plan.

Section 7.6 of the Plan reads as follows:

7.6. Substantive Consolidation for Purposes of Claim Allowance and Plan Distributions.

Each Debtor shall be substantively consolidated with each other Debtor, *nunc pro tunc* to the Petition Date, solely for purposes of the allowance of Claims and distributions under the Plan and of confirmation, consummation and implementation of the Plan, as follows: On the Effective Date, *nunc pro tunc* to the Petition Date, (i) solely for the purposes of distribution under the Plan, the assets and liabilities of each Debtor shall be deemed to be the assets and liabilities of all the Debtors and consolidated into a single estate; (ii) all guarantees by any Debtor of the obligations of any other Debtor existing prior to the Effective Date (regardless of whether such guarantee is secured, unsecured, liquidated, unliquidated, contingent, or disputed) shall be deemed liquidated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor, shall be deemed to be a single obligation of the consolidated Debtors; (iii) any joint liability (including, but not limited to joint and several liability) of any of the Debtors with one another shall be deemed to be a single obligation of the consolidated Debtors; (iv) each and every proof of claim filed or to be filed in the Cases, shall be deemed filed against the consolidated Debtors, and shall be deemed a single Claim against and obligation of the consolidated Debtors, as applicable; and (v) all duplicative claims (identical in both amount and subject matter) Filed against or deemed Filed against more than one of the Debtors shall be automatically expunged so that only one Claim survives against the consolidated Debtors (but in no way shall such surviving Claim be deemed Allowed by reason of this Section). All Claims based on guarantees of collection, payment or performance made by any Debtor as to the obligations of any other Debtor or of any other Person

shall be discharged, released and of no further force and effect; provided, however, that nothing herein shall affect the obligations of each of the Debtors under the Plan.

...Notwithstanding any other provisions of this Section 7.6, the substantive consolidation for the purposes described above shall not affect: (i) the Intercompany Claims and Interests in the Debtors, which shall be maintained, except as otherwise provided in this Plan or as modified following the Effective Date at the election of Reorganized GCX or AMCE. (emphasis added).

The U.S. Trustee argues that this provision was created by the Proponents for the primary purpose of avoiding over $700,000 in fees under § 1930. This first point of the U.S. Trustee's objection raises a number of questions for the Court, including the tests to be used in determining whether to grant *nunc pro tunc* relief and substantive consolidation and whether the parties have met their burdens under the tests.

*Nunc Pro Tunc Relief*

▮ The parties disagree on the standard that the Court should use in determining whether *nunc pro tunc* relief is appropriate. The U.S. Trustee contends that a "special showing" or a showing of "extraordinary circumstances" must be used and that the Court should extend the test used by the Third Circuit in *F/S Airlease II, Inc. v. Simon,* 844 F.2d 99 (3rd Cir.1988) and *In re Arkansas Co., Inc.,* 798 F.2d 645 (3rd Cir.1986) for determining whether to grant *nunc pro tunc* retention of professionals. The Proponents argue that no special showing is necessary and that, at most, it is only necessary to show that there is a benefit that outweighs the prejudice. Such an equity test was used by the court in *Drabkin v. Midland–Ross*

Corp. (In re Auto–Train Corp., Inc.), 810 F.2d 270 at 277 (D.C.Cir.1987).

The Third Circuit in the *F/S Airlease II* and *In re Arkansas* cases found that *nunc pro tunc* approval of professional retention required a showing of extraordinary circumstances. *F/S Airlease II*, 844 F.2d 99; *In re Arkansas*, 798 F.2d 645. The Court required this strong showing because § 327(a) of the Bankruptcy Code requires the court's *prior* approval of professional retention. In the cases of *F/S Airlease II* and *In re Arkansas* the approval of the Court was not sought before the professionals were engaged, and as such, the Court required the parties to show those circumstances that caused them not to comply with the requirement of the Code. *F/S Airlease II*, 844 F.2d 99; *Arkansas*, 798 F.2d 645.

The Bankruptcy Code does not provide a provision comparable to § 327(a) for substantive consolidation however. In fact, the Code does not provide for substantive consolidation at all. Nor does it provide for *nunc pro tunc* relief.

 *Nunc pro tunc* relief is an equitable remedy that is left to the discretion of the court. *Weil v. Markowitz*, 898 F.2d 198, 200 (D.C.Cir.1990) (noting that the issue of whether to grant *nunc pro tunc* relief is best left to the discretion of the court). Black's Law Dictionary defines *nunc pro tunc* as relief that has a retroactive legal effect. Black's Law Dictionary (7th ed 1999). It "makes now of something actually previously done" or "records that which is actually but is not recorded". *In re Bill & Paul's Sporthaus, Inc.*, 31 B.R. 345 at 348 (Bankr.W.D.Mich.1983) (citations omitted). Such relief should be "available in order to promote fairness to the parties and as justice may require". *Weil*, 898 F.2d at 200. As with any equitable relief the court should look at the particular circumstances of the case and at

a minimum, rather than as a maximum as Proponents assert, weigh the equities of the relief. *Continental Casualty Co., v. General Development Corp. (In re General Development Corp.)*, 165 B.R. 685, 690 (D.Fla.1994) (citing *Mitchell v. Overman*, 103 U.S. 62, 26 L.Ed. 369 (1880) for the principal that determination of *nunc pro tunc* relief depends on the circumstances of the particular case).

The Court need not determine in this case which of the tests proposed by the parties should be adopted as the Proponents have failed to meet even the most liberal test. In weighing the equities the U.S. Trustee asserts a significant detriment, the loss of substantial quarterly fees, that would result from the relief. The evidence clearly shows that this loss would be certain if substantive consolidation were allowed *nunc pro tunc*. The relief sought by the Plan would allow Debtors to report and pay quarterly fees on one consolidated entity with one cap of $10,000 quarterly, rather than multiple entities all with the $10,000 cap. The only benefit that the Proponents have demonstrated is that they would succeed in evading the requirement of 28 U.S.C. § 1930(a)(6) and the payment of their quarterly fees. The Proponents have failed to demonstrate any "harm" to the estate, other than the obvious decrease in assets available for distribution as a result of the quarterly fee obligation. The quarterly fees are part of the costs of bankruptcy protection, no different from filing fees. Debtors chose not to consolidate earlier. Only now, with hindsight, they seek to reap the benefits.

 The Proponents also fail to assert that there are new economic realities that the Court should now give effect to. There is no evidence that subsequent to the petition date the Debtors changed the way that they did business or that they

restructured their transactions. To the contrary, the evidence showed that the Debtors continued to do business as usual. There is no evidence that Debtors failed to request substantive relief earlier through oversight or inadvertence. To the contrary, it was suggested in closing argument that Debtors chose not to ask for this relief earlier. The Debtors chose to file as multiple entities and the Court sees no compelling reason, extraordinary or otherwise, to grant the relief requested. The purpose of *nunc pro tunc* is to memorialize what has previously occurred but failed to be recorded. The Court finds no basis to create retroactively what the Debtors elected not to pursue.

The objection of the U.S. Trustee as to *nunc pro tunc* substantive consolidation is sustained.

*Substantive Consolidation*

■■ As noted above, there is no express statutory authority for substantive consolidation. *Union Savings Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2nd Cir.1988). Substantive consolidation typically has the effect of combining the assets and liabilities of separate and distinct legal entities into a single pool and treating them as if they belong to one entity. *In re Bonham*, 229 F.3d 750, 764 (9th Cir.2000); *In re Augie/Restivo*, 860 F.2d at 518. The result is to enable the court to disregard the separate entities in order to reach the assets to satisfy debts of the related corporations. *In re Bonham*, at 764. The purpose is to "ensure the equitable treatment of all creditors." *In re Bonham*, at 764; *Augie/Restivo*, at 518.

Case law on the issue of substantive consolidation has developed two tests for substantive consolidation. One test, the test asserted by the U.S. Trustee, considers whether creditors dealt with the enti-

ties as a single economic unit and whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. *Augie/Restivo*, at 518. The *Augie/Restivo* Court looked at the following factors in determining the entanglement of the debtors: (1) the presence or absence of consolidated financial statements; (2) the unity of interests and ownership between various corporate entities; (3) the existence of parent and intercorporate guarantees on loans; (4) the degree of difficulty in segregating and ascertaining individual assets and liabilities; (5) the existence of transfers of assets without formal observance of corporate formalities; (6) the commingling of assets and business functions; (7) the profitability of consolidation at a single physical location. *Augie/Restivo*, 860 F.2d at 518.

The second test, the test asserted by the Proponents, is that the court ensure that consolidation yields benefits offsetting any harm it inflicts on objecting parties. *In re Auto–Train Corp., Inc.*, 810 F.2d 270 at 276. The proponent of the plan must show that there is a substantial identity between the entities and that consolidation is necessary to either avoid some harm or realize some benefit. *Id.* After this has been shown, a creditor may object on the grounds that it will be prejudiced by the consolidation. *Id.* The Court then weighs the harm against the benefit. *Id.*

■■ Both tests provide a similar analysis. The first is to look at the relationship among the entities. It is clear from the evidence that this prong is met under both tests. The substantial identity requirement of *Auto–Train* is evidenced through the use of the common name, General Cinemas, the use of the single letterhead, the use of the single cash management system, the everyday use of the intercompany transactions, the corporate nature of the operational transactions such

as the supply contracts and the special ticket promotions. The *Augie/Restivo* test yields the same result. The evidence shows: that only consolidated financial statements are provided to external users; there is common ownership of the entities through GCX and GCT; there is a unity of interests as evidenced through the supply contracts; there is a daily use of intercorporate transactions; the significant loans of GCX are guaranteed by the Theater Operating Units; the cash management system sweeps the funds into a common account on a daily basis. The evidence is quite compelling on a majority of the factors set forth by the *Augie/Restivo* Court.

The second prong of both tests is in effect an exercise in balancing the equities in favor and against. It is clear that the creditor body, who always dealt with the Debtors as a unit (except for perhaps the theater landlords), will benefit from substantive consolidation in that the Plan will be more efficient and more effective if the assets of the estates are pooled together. The alternative is a laborious and time consuming task of breaking down the details of the books of the respective Debtors without a resulting benefit to the creditor body. Because of the various guarantees given by the Theater Operating Units for certain liabilities of GCX and GCT and likewise the guarantees of GCX and GCT for the major transactions of the Theater Operating Units, the results may very well be the same, but without the accounting exercises.

While substantive consolidation may decrease the amounts owed to the office of the U.S. Trustee in quarterly fees, the ease of administrative burdens that substantive consolidation yields will far outweigh the prejudice. No creditor other than the U.S. Trustee has stepped forward to object to substantive consolidation. To the contrary, the classes of creditors enti-tled to vote have overwhelmingly shown their support.

The objection of the U.S. Trustee to prospective substantive consolidation as set forth in Section 7.6 of the Plan is overruled.

*United States Trustee Fees Under 28 U.S.C. § 1930(a)(6)*

■ 11 U.S.C. § 1129(a)(12) states that "the court shall confirm a plan only if all of the following requirements are met: (12) All fees payable under section 1930 of title 28, as determined by the court at a hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."

28 U.S.C. § 1930(a)(6) states the following:

(a) Notwithstanding section 1915 of this title, the parties commencing a case under title 11 shall pay to the clerk of the district court or the clerk of the bankruptcy court, if one has been certified pursuant to section 156(b) of this title, the following fees: (6) in addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof until the case is converted or dismissed, whichever occurs first). The fee shall be $250 for each quarter in which disbursements total less than $15,000; $500 for each quarter in which disbursements total $15,000 or more but less than $75,000; $750 for each quarter in which disbursements total $75,000 or more but less than $150,000; $1,250 for each quarter in which disbursements total $150,000 or more but less than $225,-000; . . . $10,000 for each quarter in which disbursements total $5,000,000 or more. The fee shall be payable on the last day

of the calendar month following the calendar quarter for which the fee is owed. 28 U.S.C. § 1930(a)(6) (emphasis added).

The disagreement between the parties comes down to the definition of "disbursements". The U.S. Trustee asserts that "disbursements" is equivalent to the accounting definition of expenses, that an entity should be attributed with those costs that were incurred (used by) the entity. The equivalent accounting principle is the matching principle, where revenues are matched with the expenses that result from the generation of the revenue.

Congress provided no definition of "disbursement" for purposes of section 1930. The common legal definition of disbursement is "the act of paying out money". Black's Law Dictionary (7th ed.1999). The courts in the *Central Copters, Flatbush* and *Hays Builders* cases found that payments made by third parties may be deemed constructive disbursements by a debtor. *In re Central Copters, Inc.*, 226 B.R. 447 (Bankr.D.Mont.1998). *In re Flatbush Assocs.*, 198 B.R. 75 (Bankr. S.D.N.Y.1996); *Office of the U.S. Trustee v. Hays Builders, Inc. (In re Hays Builders, Inc.)*, 144 B.R. 778 (W.D.Tenn.1992). The logical extension of the holdings of these three courts is that a disbursement is a payment on the legal obligation of the debtor.

An analysis of the application of this principle to the Debtors can be made clear by examples of the concessions purchases and wage costs.

The evidence demonstrated that GCT alone contracts with Dr. Pepper/Cadbury North America, Inc. for the purchase of concessions products. Any claims or legal remedies that Dr. Pepper/Cadbury North America, Inc. has regarding the concessions contract are solely against GCT. The obligations under that contract belong to GCT and all disbursements relating to the supply of concessions by Dr. Pepper/Cadbury should be attributed to GCT. It makes no difference that GCT then distributes the goods to the Theater Units and allocates the intercompany accounts for the consumption of the goods. It also makes no difference if the checks to pay the related invoices are paid from GCT or some other entity.

The individual Debtor Operating Subsidiary that enters into a lease or may employ an employee, or incurs a repair cost should be attributed with the disbursements for those items. The employee has recourse against its employer and that employer is assigned the obligations associated with the employee, no matter who actually pays the salary.

To define disbursements solely as an outflow of cash would allow for easy manipulation of cash payments in order to evade the provisions of § 1930(a)(6). To go further and find disbursements to be an expense, using the appropriate accounting definition or principle, would create a bookkeeping nightmare. A room full of ten accountants may very well provide ten different opinions on allocation methods. The calculation of fees would result in a battle of accounting experts.

The U.S. Trustee estimates that the Debtors have underpaid their fee obligation through December 2001 by more than $700,000. This amount was calculated by an allocation using schedules from previous years' tax returns that set forth expenses per Debtor. A percentage was calculated for each Debtor's expense to the total consolidated expense on the tax return. These percentages were then multiplied against the consolidated MORs to get an estimated monthly disbursement total per Debtor. These estimated disbursement amounts were then applied to the fee schedule set forth in § 1930(a)(6). Those

calculations failed to consider actual current expenses and did not reflect theater closings that occurred during the pendency of this Chapter 11 proceeding.

Debtors filed consolidated MORs, rather than treat each debtor as a separate entity, and calculated their fee obligations from these consolidated reports.

Given the resolution of the Court on the various matters before it, it is clear that neither the U.S. Trustee nor the Debtors have calculated the correct amount of the fee obligations. With the evidence given, the Court is unable to make a determination as to the correct amount of the U.S. Trustee fees. As such, Debtors shall refile their MORs in accordance with the rulings of this Court on an individual Debtor basis on or before April 15, 2002. Included with the MORs shall be supporting documentation to support the disbursements shown, so as to satisfy the U.S. Trustee of the accuracy of the MORs. Debtors shall provide for a reserve sufficient to pay the U.S. Trustee fees.

## CONCLUSION

For the reasons set forth above, Confirmation of the First Amended Joint Plan of Reorganization is granted conditioned upon the striking of the *nunc pro tunc* language in section 7.6 and the filing of the monthly operating reports for each individual Debtor on or before April 15, 2002. The monthly operating reports shall have appended all necessary supporting documents to satisfy the U.S. Trustee of the appropriate designation of "disbursements".