**In re MARS STORES, INC.; Gaynes Department Stores, Inc.; Mars Leasing Co., Inc.; and Big Value Outlets, Inc., Debtors.**

**Frank T. SACCURATO, Jr. as Creditors' Trustee of Mars Stores Inc., Gaynes Department Stores, Inc., Mars Leasing Co., Inc., Big Value Outlets, Inc., Plaintiffs,**

v.

**SHAWMUT BANK, N.A. Individually and as Agent for National Westminster Bank, USA, and National Westminster Bank USA, Defendants.**

Bankruptcy Nos. 89–10439–JNF, 89–10523–JNF, 89–10514–JNF and 90–12484–JNF.

Adv. No. 91–1558.

United States Bankruptcy Court,
D. Massachusetts.

Feb. 17, 1993.

---

Michael B. Roitman, Boston, MA, for Frank T. Saccurato, Jr. as Creditors' Trust Trustee.

Charles R. Bennett, Jr., Boston, MA, for Shawmut Bank, N.A., et al.

## MEMORANDUM

JAMES A. GOODMAN, Chief Judge.

## I. INTRODUCTION

An involuntary Chapter 7 petition was filed against Mars Stores, Inc. ("Mars") on February 21, 1989. One week later, on March 1, 1989, and on the same day Mars converted the involuntary Chapter 7 to a voluntary Chapter 11 proceeding, two of its wholly owned subsidiaries, Gaynes Department Stores, Inc. ("Gaynes") and Mars

Leasing Co., Inc. ("Leasing"), filed voluntary Chapter 11 petitions. Big Value Outlets, Inc. ("Big Value"), another subsidiary of Mars, filed a voluntary Chapter 11 on May 15, 1989.

The above-captioned adversary proceeding was commenced on October 1, 1991 by Frank T. Saccurato, Jr. as the Creditors' Trustee ("Saccurato" or the "Creditors' Trustee") of the Debtors. It is the last remaining piece of business that must be concluded before these three-year old cases can be closed.

Saccurato's complaint contains four counts. Count I is predicated upon the recovery of preferential payments; Count II is predicated upon the avoidance of preferential liens; and Counts III and IV are predicated upon federal and state fraudulent conveyance statutes, respectively. *See* 11 U.S.C. § 548 and Mass.Gen.Laws Ann. Ch. 109A, §§ 1–13 (West 1990) (hereinafter the "UFCA"). Shawmut Bank, N.A., for itself and as agent for National West Minister Bank USA ("Nat West") (collectively "Shawmut"), filed an answer to the complaint in which it moved to dismiss on grounds that the complaint is barred by the applicable statute of limitations. Shawmut also asserted numerous other affirmative defenses.

The matter now before the Court is the "Motion of Shawmut Bank, N.A. for Summary Judgment." Its resolution depends in part on the Court's rulings with respect to two other outstanding motions: "Motion of Shawmut Bank, N.A. to Strike Plaintiff's Supplemental Responses to Interrogatories and to Preclude Plaintiff from Producing Expert Testimony;" and 2) "Motion of Shawmut Bank, N.A., to Strike Affidavit of Joseph D. Cronin."

On August 31, 1992, the same day that Shawmut filed its motion for summary judgment, the parties filed a "Joint Pretrial Statement by and among Frank T. Saccurato as Creditors' Trustee, Shawmut Bank, N.A., Individually and as Agent for National Westminster Bank, USA." In their Joint Pretrial Statement, the parties set forth the following: 1) Undisputed Facts; 2) Contested Issues of Fact; 3) Legal Issues; 4) Proposed Witnesses; and 5) Proposed Exhibits. The Court adopts the parties' statement of undisputed facts, which are set forth below.

## II. UNDISPUTED FACTS

### A. Jurisdiction

This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334. This action is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

### B. Parties

The Debtors' Liquidating Plan of Reorganization (the "Plan") was confirmed by this Court on March 21, 1991. Pursuant to section 7.3 of the Plan, a Creditors' Trustee was duly appointed as the representative of the Debtors' estates and empowered to pursue causes of action of the Debtors, including but not limited to claims against Shawmut and Nat West under sections 544–552 of the Bankruptcy Code.

Prior to April 4, 1991, Mars was a Massachusetts corporation with a principal place of business located at One Riverside Avenue, New Bedford, Massachusetts. Its subsidiary, Gaynes was a Vermont corporation with a principal place of business located at One Riverside Avenue, New Bedford, Massachusetts. Its other subsidiaries, Leasing and Big Value, were Massachusetts corporations with principal places of business also located at One Riverside Avenue, New Bedford, Massachusetts.

Shawmut is a national banking organization organized and existing under the laws of the United States, with a principal place of business located at One Federal Street, Boston, Massachusetts. It is a creditor of Mars.

Nat West is a New York corporation with a principal place of business located at 175 Water Street, New York, New York. It also is a creditor of Mars.

### C. Background

Mars was engaged in the operation of a chain of self-service discount department stores. Its stores, the first of which was opened in 1960, carried a broad range of merchandise including soft goods, such as wearing apparel, shoes, domestics, fabrics,

yarns, and hard goods, such as hardware, housewares, small appliances, sporting goods, automotive supplies, jewelry, gifts, health and beauty aids, school supplies, stationery, greeting cards, music equipment and supplies, paints, garden supplies, art supplies, film, cameras and related accessories.

Mars operated a varying number of department stores (ranging approximately from six to twenty stores) in Massachusetts, Maine, New Hampshire, Rhode Island and Connecticut. The majority of Mars' department stores were located in Massachusetts.

Mars formed Gaynes for the purpose of purchasing Gaynes' department store in Burlington, Vermont. Gaynes subsequently opened a second Gaynes store in Fishkill, New York. Gaynes closed the Fishkill store in 1988.

### 1. Bankruptcy Filing

An informal creditors' committee was formed prior to the February 21, 1989 bankruptcy filing. This committee was chaired by Saccurato. One of the main reasons for the filing of the involuntary petition was the belief on the part of the informal creditors' committee that a preferential transfer had been made by Mars to Shawmut.

On March 21, 1991, this Court confirmed the Plan, pursuant to which the Creditors Trust was created and Saccurato appointed as the Creditors' Trustee. On April 4, 1991, the Court entered a separate written order pursuant to which the Chapter 11 proceedings for Mars, Gaynes, Leasing and BVO were substantively consolidated.

### 2. Loan Arrangements with Shawmut and Nat West

On September 18, 1986, Shawmut and the Debtors entered into a loan arrangement ("Loan Arrangement") whereby Shawmut agreed to advance up to $10,000,-000.00 pursuant to committed demand loans. Subsequent to 1986, the Loan Arrangement was amended and modified several times. The Loan Arrangement was amended twice in 1987. Neither of the 1987 amendments are relevant to this proceeding.

Prior to January 30, 1988, neither Shawmut nor Nat West obtained any security interests in any assets of Mars, Gaynes, Leasing or Big Value pursuant to the September 18, 1986 loan agreement (except for certain fixtures financing and liens not material to this proceeding).

On January 30, 1988, Shawmut and the Debtors entered into a third amendment to the Loan Arrangement (the "Third Amendment"). Pursuant to the Third Amendment, Mars paid in full two outstanding demand notes, and the commitment on the revolving line of credit was changed to $8,500,000.00. The revolving line of credit was evidenced by two new promissory notes—one in the original amount of $5,100,000.00 payable to Shawmut, and the other in the original amount of $3,400,-000.00 payable to Nat West. In order to secure their obligations to Shawmut under the Third Amendment, Mars and Gaynes agreed to grant Shawmut a Collateral Assignment of Leases to all of their store locations.[1] Landlords at certain locations consented to the Collateral Assignment of Leases to Shawmut.[2]

On January 30, 1988, Mars, Leasing and Gaynes executed security agreements in favor of Shawmut. In connection with the Third Amendment, Shawmut perfected its security interest in the Mars collateral by filing UCC–1 Financing Statements.[3] In

---

1. These locations included but were not limited to the following: South Burlington, VT; Hudson, MA; Dartmouth, MA; North Smithfield, RI; Pelham, NH; Bangor, ME; North Haven, CT; Plainville, CT; Ludlow, MA; Medway, MA; Attleboro, MA; Chicopee, MA; New Bedford, MA; Dudley, MA; Salisbury, MA; Athol, MA; South Portland, ME; and Berlin, NH.

2. Landlords at the following locations consented: Athol, MA; Burlington, VT; Dartmouth, MA; Dudley, MA; Hudson, MA; New Bedford, MA; Salisbury, MA; and S. Portland, ME.

3. The locations of the filings included the following: Secretary of the Commonwealth of Massachusetts on February 3, 1988 as Instrument No. 758045; Dighton Town Clerk, on Feb-

connection with the Third Amendment, Shawmut perfected its security interest in the Gaynes collateral by filing UCC–1 Financing Statements.[4] In connection with the Third Amendment, Shawmut perfected its security interest in the Leasing collateral by recording UCC–1 Financing Statements.[5]

On July 22, 1988, the Debtors and Shawmut entered into a Fourth Amendment to the Loan Arrangement ("Fourth Amendment"). Pursuant to the Fourth Amendment, the revolving committed amount was increased to $10,000,000.00. Mars executed two new promissory notes—one in the amount of $6,000,000,000.00 payable to Shawmut, and the other in the amount of $4,000,000.00 payable to Nat West.

On or about November 23, 1988, the Debtors and Shawmut entered into a Fifth Amendment to the September 18, 1986 Loan Arrangement ("Fifth Amendment"). Among other things, the Fifth Amendment modified the Loan Arrangement by increasing the line of credit to $11,500,000.00. As part of the Fifth Amendment, Mars executed a Promissory Note in the amount of $6,900,000.00 payable to Shawmut and a Promissory Note in the amount of $4,600,000.00 payable to Nat West. Additionally, on November 23, 1988, as part of the Fifth Amendment, Gaynes and Mars executed Security Agreements.

Shawmut filed appropriate UCC–1 Financing Statements with the Secretary of the Commonwealth of Massachusetts on November 25, 1988 and with the other Secretary of States' Offices on November 28, 1988, thereby duly perfecting its security interest in the assets of the Debtors.

On December 27, 1988, the Loan Arrangement was again amended (the "Sixth Amendment"). In connection with the Sixth Amendment, Shawmut and the Debtors executed various documents including but not limited to the following: Loan, Agency and Security Agreement, $3,000,000.00 Master Note payable to Shawmut, $2,000,000.00 Master Note payable to Nat West, $2,400,000.00 Term Note payable to Shawmut, $1,600,000.00 Term Note payable to Nat West, and Interest Deferral Notices. The Term Notes provided for specific payments commencing on May 1, 1990 and continuing through February 1, 1992. Shawmut filed UCC–1 Financing Statements with the appropriate authorities in regard to the Sixth Amendment.

### 3. Post–Petition Transactions

During the bankruptcy proceeding, Mars sold its remaining leasehold interests for the following amounts:

| Store Location | Sale Price | Estimated Waiver of Damage Claim |
|---|---|---|
| Plainville, CT | $ 690,000 | $ 120,000 |
| Ludlow, MA | 625,000 | 115,000 |
| Chicopee, MA | 35,000 | 125,000 |
| Pelham, NH | 665,000 | 180,000 |
| Athol, MA | 520,000 | 145,000 |
| Salisbury, MA | 500,000 | 152,000 |
| Medway, MA | 35,000 | 104,000 |
| North Smithfield, RI | 350,000 | 176,000 |
| So. Portland, ME | 16,000 | 94,000 |
| Attleboro, MA | 75,000 | 200,000 |
| TOTALS | $3,511,000 | $1,441,000 |

ruary 5, 1988, at Book, 13, No. 844; Secretary of State's Office, State of Connecticut, on February 17, 1988 as Instrument No. 749381; Secretary of State's Office, State of Vermont; Secretary of State's Office, State of Rhode Island, on February 4, 1988 as Instrument No. 534416; and Secretary of State's Office, State of New Hampshire, on February 4, 1988 as Instrument No. 277860.

4. The locations of the filings included the following: Secretary of the Commonwealth—Recorded on February 3, 1988 as Document No. 758046; Dighton Town Clerk—Recorded on February 5, 1988 in Book 13, Number 843; Secretary of State—Maine—Recorded on February 4, 1988 as Document No. 768118; Secretary of State—Connecticut—Recorded on March 1, 1988 as Document No. 751567; Secretary of

State—Vermont; Secretary of State—Rhode Island—Recorded on February 4, 1988 as Document No. 534414; and Secretary of State—New Hampshire—Recorded on February 4, 1988 as Document No. 277861.

5. The locations included the following: Secretary of the Commonwealth—Recorded on February 3, 1988 as Document No. 75807; Dighton Town Clerk—Recorded on February 5, 1988 in Book 13, Number 842; Secretary of State— Maine—Recorded on February 4, 1988 as Document No. 768119; Secretary of State—Connecticut—Recorded on March 1, 1988 as Document No. 751568; Secretary of State—Vermont; Secretary of State—Rhode Island—Recorded on February 4, 1988 as Document No. 534415; and Secretary of State—New Hampshire—Recorded on February 4, 1988 as Document No. 277862.

Mars rejected its leases in the following locations: Berlin, CT; Dudley, MA; Hudson, MA; and New Haven, CT. Mars also sold the fixtures and equipment in its stores for a total of $556,097.[6]

During the bankruptcy proceeding, Gaynes sold its Burlington lease for $375,000.00, plus a waiver of an estimated damage claim of $620,000.00. Additionally, it sold its fixtures for $50,000.00

Shawmut filed a Proof of Claim in the principal amount of $8,186,150.00.

## III. ISSUES

The motion for summary judgment raises a number of issues. Although the parties phrase them differently, they are in agreement that they include the following:

1) Whether the statute of limitations set forth in 11 U.S.C. § 546(a)(1) bars the Creditors' Trustee's complaint?

2) Whether substantive consolidation of the Debtors' cases enables the Creditors' Trustee to bring preference actions on behalf of the estate of Gaynes, since the case was filed more than 90 days after the November 23, 1988 transaction?

3) Whether Shawmut had a security interest in the Debtors' assets as of January 1, 1988?

4) Whether the Debtors were insolvent for purposes of 11 U.S.C. § 547?

5) Whether payments made by Mars during the preference period were in the ordinary course of business between Mars and Shawmut? and

6) Whether the granting of security interests by Mars and Gaynes in November and December of 1988 constituted fair consideration or fair value since the security interests secured antecedent debt?

## IV. DISCUSSION

### A. Summary Judgment Standard

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which is made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056. Summary judgment is appropriate when there are no genuine issues as to any material facts, and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant bears the initial burden of proving the absence of any genuine issues of material fact. It is then up to the opposing party to set forth specific material facts that are in dispute. The opposing party may not simply rely upon its pleadings but must produce significant evidence to support its contentions. However, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the opposing party, and there must be no controversy as to the inferences to be drawn from those facts. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). *See generally In re Katz*, 146 B.R. 617, 619–20 (Bankr.E.D.N.Y.1992).

### B. Statute of Limitations

The statute of limitations set forth in section 546(a) of the Bankruptcy Code applies to both the preference and fraudulent conveyance counts brought by the Creditors' Trustee against Shawmut. It provides in relevant part:

(a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—

(1) two years after the appointment of a trustee under section 702, 1104, 1163, 1302, or 1202 of this title; or

(2) the time the case is closed or dismissed.

11 U.S.C. § 546(a).

Shawmut urges the Court to rule that the two year statute of limitations set forth in section 546(a)(1) applies to debtors in possession and thus bars the instant proceeding. Were the Court to so hold, the

---

**6.** Chicopee, MA—$15,000; Pelham, NH—$106,000; Salisbury, MA—$205,000; Athol, MA—$113,000; Berlin, CT—$20,000; New Bedford, MA—$15,479; Attleboro, MA—$11,602; Hudson, MA—$8,384; Medway, MA—$2,332; North Smithfield, RI—$13,500; Dudley, MA—$10,800; Medway, MA—$15,000; and Dartmouth, MA—$20,000.

Court would be compelled to enter summary judgment in favor of Shawmut since it is undisputed that the Creditors' Trustee commenced this action more than two years after the cases were filed.

Shawmut relies upon *Zilkha Energy Company v. Leighton,* 920 F.2d 1520 (10th Cir.1990) (hereinafter *Zilkha*), the only circuit court opinion to construe section 546(a). In that case, the Court of Appeals for the Tenth Circuit stated:

> The key to this case is the scope of § 546(a), and the question to resolve is whether a debtor in possession is subject to the same two-year statute of limitations as an appointed trustee. We believe § 546 is ambiguous; therefore, it must be construed. We do not believe that Congress intended to limit actions filed by an appointed trustee to two years without making the same restriction apply to a debtor in possession who is the functional equivalent of an appointed trustee. Because of the virtual identity of function between a trustee and a debtor in possession, there would be no reason to create a different limitation period for the filing of actions by the two fiduciaries. Moreover, when the balance of § 546 is considered, it is even more apparent that Congress intended for the word "trustee" to apply to a debtor in possession, for every reference to actions brought by a trustee contained in § 546 obviously applies to actions brought by a debtor in possession. A contrary analysis would deprive § 546 of significance in the majority of recovery actions filed in chapter 11 cases.

> Consequently, we construe § 546(a)(1) to apply to actions filed by a debtor in possession, and we believe the period of limitations begins to run from the date of the filing of a petition for reorganization under chapter 11. We reach that conclu-

sion because the debtor becomes a debtor in possession on that date.

920 F.2d at 1524 (footnotes omitted).

Shawmut also cites legislative history pertaining to sections 522 and 1107 of the Bankruptcy Code. Specifically, Shawmut relies upon the following language relative to section 522(h), which allows individual debtors to avoid transfers or recover setoffs to the extent of their exemptions in certain situations in which the trustee has failed to act:

> the section is primarily designed to give the debtor the rights the trustee could have pursued if the trustee chooses not to pursue them. The debtor is given no greater rights under this provision than the trustee, and thus, the debtor's avoiding powers under proposed 11 U.S.C. 544, 545, 547, and 548, are subject to proposed 11 U.S.C. 546, as are the trustee's powers.

H.R. No. 595, 95th Cong., 1st Sess. 362–363 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 76–77 (1978). Shawmut, however, fails to note that section 522 pertains to individual debtors only and to discuss the implications of this language for corporate debtors.

With respect to section 1107 of the Bankruptcy Code,[7] Shawmut cites the following language:

> This section places a debtor in possession in the shoes of a trustee in every way. The debtor is given the rights and powers of a chapter 11 trustee. He is required to perform the functions and duties of a chapter 11 trustee (except the investigative duties). He is also subject to any limitations on a chapter 11 trustee, and to such other limitations and conditions as the court prescribes.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 404 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 116 (1978). Thus, in Shawmut's view, the legislative history subjects debtors in possession to the same limitations as a trustee

---

7. Section 1107(a) provides:
   (a) Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compen-

sation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter. 11 U.S.C. § 1107(a).

and clearly does not reveal any intention to give them any greater rights than trustees.

Shawmut also argues that when the statute of limitations is considered in light of the entire Bankruptcy Code, particularly section 1107(a), it is evident that section 546(a)(1) applies to debtors in possession. Additionally, Shawmut maintains that the object and policies of the Bankruptcy Code and the policies and purposes of a two year statute of limitation coincide and support the two year statute of limitations. Moreover, Shawmut, in order to rebut contentions that debtors in possession lack the motivation to bring avoidance actions, points to the fact that a creditors' committee with its significant watchdog role can initiate avoidance actions if the debtor in possession refuses to act. *Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1362–63 (5th Cir.), *reh'g denied, en banc*, 801 F.2d 398 (5th Cir.1986); *In re STN Enterprises*, 779 F.2d 901, 904 (2nd Cir.1985); *In re Nicolet, Inc.*, 80 B.R. 733, 738 (Bankr.E.D.Pa.1988).

Finally, Shawmut cites *Sparmal Enterprises, Inc. v. Moffit Realty Corp. (In re Sparmal Enterprises, Inc.)*, 126 B.R. 559, 563 (S.D.Ind.1991), for the alternative proposition that the two year statute of limitations at least should apply to debtors in possession who are liquidating. Shawmut notes that in April of 1989, Mars had abandoned hope of continuing as a going concern. Accordingly, Shawmut maintains that, even if there is some merit in the argument that the statute of limitations should not apply to Chapter 11 debtors who are attempting to formulate consensual plans or whose principals may have guaranteed obligations to lenders with avoidable liens, these scenarios do not pertain to the instant case because of the decision to liquidate.

The Creditors' Trustee counters every one of Shawmut's arguments. He points to the plain language of the statute and notes that all but a few cases after *Zilkha* have rejected its analysis. *Compare Cardullo v. Dwyer Mechanical Corp. (In re Cardullo)*, 142 B.R. 138 (Bankr.E.D.Va. 1992); *Freedom Ford, Inc. v. Sun Bank &*

*Trust Co. (In re Freedom Ford, Inc.)*, 140 B.R. 585 (Bankr.M.D.Fla.1992); *Pate v. Hunt (In re Hunt)*, 136 B.R. 437 (Bankr. N.D.Tex.1991); *In re Allegheny International, Inc.*, 136 B.R. 396 (Bankr.W.D.Pa. 1991) *aff'd*, 145 B.R. 823 (W.D.Pa.1992); *Pullman Construction Industries, Inc. v. National Steel Service Center (In re Pullman Construction Industries, Inc.)*, 132 B.R. 359 (Bankr.N.D.Ill.1991); *Mancuso v. Continental Bank National Association Chicago (In re Top Core, Inc.)*, 132 B.R. 119 (Bankr.N.D.Tex.1991); *United States Lines (S.A.), Inc. v. U.S. (In re McLean Industries, Inc.)*, 132 B.R. 247 (Bankr. S.D.N.Y.1991); *Katon v. The International Bank of Miami, N.A. (In re Tamiami Range and Gun Shop, Inc.)*, 130 B.R. 617 (Bankr.S.D.Fla.1991); *Caplan v. United States Brass & Copper Co. (In re Century Brass Products, Inc.)*, 127 B.R. 720 (Bankr. D.Conn.1991) *with Knapp v. Applewhite (In re Knapp)*, 146 B.R. 294 (Bankr. M.D.Fla.1992); *Sparmal Enterprises, Inc. v. Moffit Realty Corp. (In re Sparmal Enterprises, Inc.)*, 126 B.R. 559 (S.D.Ind. 1991); *Construction Management Services, Inc. v. Manufacturers Hanover Trust Company (In re Coastal Group, Inc.)*, 125 B.R. 730 (Bankr.D.Del.1991). Moreover, most cases decided before *Zilkha* reject the view that section 546(a)(1) applies to debtors in possession. *See Korvettes, Inc. v. Sanyo Electric, Inc. (In re Korvettes, Inc.)*, 67 B.R. 730 (S.D.N.Y.1986); *AOV Industries, Inc. v. Saltzstein (In re AOV Industries, Inc.)*, 62 B.R. 968 (Bankr. D.D.C.1986); *Alithochrome, Inc. v. East Coast Finishing Corp. (In re Alithochrome, Inc.)*, 53 B.R. 906 (Bankr.S.D.N.Y. 1985); *Boatman v. E.J. Davis Corp. (In re Choice Vend, Inc.)*, 49 B.R. 719 (Bankr. D.Conn.1985); *contra Lill v. Bricker (In re Lill)*, 116 B.R. 543 (Bankr.N.D.Ohio 1990).

The Creditors' Trustee rejects Shawmut's reliance on the legislative history and argues that the facts of this case demonstrate why *Zilkha* should not apply. In particular, he notes that the cash collateral agreement that existed between Shawmut and the Debtors would have terminated if the Debtors had commenced preference ac-

tions against Shawmut. Without the use of cash collateral, he argues, the orderly liquidation of the Debtors' assets would have been precluded and conversion to Chapter 7 would have been inevitable.

The resolution of this issue is facilitated by recent Supreme Court pronouncements relative to statutory construction. In *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989), the Supreme Court observed that the task of construing a statute begins with the language of the statute. It stated that "[t]he plain meaning of legislation should be conclusive except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of the drafters.... In such cases the intention of the drafters, rather than the strict language controls." *Id.* at 241, 109 S.Ct. at 1031 (citation omitted).

On its face, the language of section 546(a)(1) appears plain enough. Courts that have found section 546(a)(1) to be ambiguous have done so by finding that subsection (a) declares that it applies to *all actions* under sections 544, 545, 547, 548 and 553, while "the appointment of a trustee" language seemingly precludes application of the two-year limitation period to Chapter 11 cases in which section 1107 gives trustee status to debtors in possession. *See In re Sparmal Enterprises, Inc., supra*, at 561. Having found (or created) the necessary ambiguity, courts following *Zilkha* proceed to equate debtors in possession with Chapter 11 trustees, relying upon the language of section 1107(a).

This Court respectfully declines to follow *Zilkha* for several reasons. In the first place, this Court finds that section 546(a)(1) is not ambiguous and thus must be enforced according to its terms. *See U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. at 241, 109 S.Ct. at 1031. As the court in *In re Hunt, supra*, recently stated:

> If § 546(a)(1) simply read "two years after the appointment of a trustee" and left out the specific Code sections Congress chose to include, the Court might be more inclined to accept the analysis in

*Zilkha* that the statute is ambiguous and that Congress' use of "trustee" was meant to apply to debtors in possession as well as appointed trustees. However, the inclusion of the enumerated sections makes it clear that Congress intended § 546(a)(1) to apply only to trustees appointed under one of those sections, and not to debtors in possession.

*Id.* at 447 n. 11.

Application of the two-year statute of limitations to debtors in possession can yield a number of complications. Indeed, the court in *Zilkha* noted that it took no position on whether the subsequent appointment of a Chapter 11 trustee would change its analysis. *Zilkha*, 920 F.2d at 1524 n. 11. It stated: "[w]hile we perceive that to be a distinguishable circumstance requiring a different analysis, we leave the issue for a case in which that situation arises." *Id.* Were the Court to conclude that the two-year limitation period runs from the filing of a Chapter 11 petition, and assuming another two-year period begins upon the appointment of a Chapter 11 trustee or the conversion of the Chapter 11 case to Chapter 7, 12 or 13, the limitation period set forth in section 546(a)(2) would never come into play. Since Congress included section 546(a)(2) in the Bankruptcy Code, this Court presumes it must apply to some scenario. That scenario must be one involving debtors in possession. This Court has great difficulty concluding, for example, that a Chapter 7 trustee appointed more than two years after the filing of a Chapter 11 case that cannot be reorganized would be barred by section 546(a)(1) from initiating adversary proceedings to set aside preferences or fraudulent conveyances.

Moreover, as the district court in *Korvettes, Inc. v. Sanyo Electric (In re Korvettes, Inc.), supra*, noted several cases holding that section 546(a)(1) does not apply to debtors in possession were on record when Congress amended the Bankruptcy Code in 1984. Accordingly, since it can be presumed that Congress was aware of these constructions of existing law, its failure to amend section 546(a)(1) to include

debtors in possession within its ambit supports the view that that section does not apply to them. *In re Hunt*, 136 B.R. at 437; *In re Korvettes, Inc.*, 67 B.R. at 733.

■ Since the language of the statute is unambiguous, this Court need not examine the intent of Congress with respect to its meaning. *In re Cardullo, supra.* The Court finds that this is not the "rare case" in which the literal application of the statute would produce a result demonstrably at odds with the intention of the drafters, particularly as that intention is far from clear. Additionally, the Court is not persuaded that the limitations referred to in the legislative history of section 1107 refer to the statute of limitations set forth in section 546(a)(1).

■ The Court finds that the two year statute of limitations does not begin to run upon the filing of a chapter 11. Moreover, this Court disagrees with those courts that have held that the statute of limitation begins to run from the appointment of liquidating trustees or other representatives appointed under plans of reorganization. *See In re Gibbons–Grable Co.*, 142 B.R. 164 (Bankr.N.D.Ohio 1992); *In re AOV Industries, Inc., supra.* As the court in *In re Hunt, supra,* noted, since trustees appointed pursuant to plans of reorganization are not trustees appointed under sections 702, 1104, 1163, 1302, or 1202 of the Code, section 546(a)(1) does not apply to them. 136 B.R. at 449. Thus, section 546(a)(2) is the only statute of limitations applicable to this case, and the Creditors' Trustees' complaint is not barred.

## C. The Effect of Substantive Consolidation on the Reach Back

### Period for Preferences

Section 547(b) of the Bankruptcy Code provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and .

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). Shawmut urges the Court to find that the November 23, 1988 transfer is outside the 90 day preference period for Gaynes. The Creditors' Trustee, in response, argues that when an order substantively consolidating bankruptcy cases is entered the lookback period is computed with reference to the earliest filed case.

Shawmut presents two arguments. First it asserts that since the order allowing substantive consolidation was not *nunc pro tunc* there can be no relation back to the earliest petition date. Secondly, citing *Drabkin v. Midland–Ross Corp. (In re Auto–Train Corp. Inc.)*, 810 F.2d 270 (D.C.Cir.1987), it maintains that there is an "additional and slightly different balancing process" that must be undertaken before a consolidation order is given retroactive effect, and that the Creditors' Trustee has failed to establish that the benefits of a retroactive order outweigh the harm inflicted. *Id.* at 276–77.

On August 10, 1990, the Debtors collectively filed a nine-page motion captioned "Debtors' Motion for Substantive Consolidation." The motion was allowed on April 4, 1991 in conjunction with the confirmation of the Debtors' Plan. The Debtors' identi-

fied five grounds for allowance of their motion, including the following:

(a) most creditors of the Debtors extended credit in reliance on the financial capabilities of the Mars affiliated group rather than that of an individual Debtor; (b) Mars and Gaynes accounted for liabilities on a consolidated basis, and it would require substantial time and effort to determine the distinct obligations of Mars and Gaynes to their creditors; (c) apportioning the remaining assets of the estate (principally causes of action against Shawmut Bank, N.A. and Masters, Inc.) among the Debtors in accordance with their respective "ownership" of such assets would be difficult if not guesswork; (d) even if claims and assets could be apportioned accurately, the cost of doing so would greatly exceed any theoretical harm to particular creditors from substantive consolidation; and (e) substantive consolidation of the Debtors' estates in bankruptcy will merely recognize and affirm the nature of the relationships among the Debtors and their creditors.

In the body of their motion, the Debtors alleged that:

Mars obtained working capital financing, for itself and for Gaynes, from Shawmut Bank, N.A. ("Shawmut"), and Gaynes guaranteed Mars' obligations to Shawmut. Shawmut made advances to the Debtors jointly rather than to Mars and Gaynes separately. No accounting of Shawmut loans made separately to Mars and to Gaynes was kept by the Debtors or Shawmut. Advances by Shawmut were made into one account for use by Mars and, at Mars' direction, by Gaynes and repayments of the Shawmut loans were made by Mars alone.

\*   \*   \*   \*   \*   \*

Apportioning the amount of Mars' and Gaynes' respective liabilities for repayment of loans to Shawmut would also prove difficult. The Debtors did not keep separate loan balances with Shawmut, nor did they account for the portion of the loan proceeds used by Gaynes....

Shawmut was served a copy of this motion and did not object.

In *In re Auto–Train Corp., Inc., supra,* the court considered the issue of whether the bankruptcy court properly ordered a subsidiary's retroactive consolidation with the bankruptcy case filed by its parent corporation. The order entered by the bankruptcy court, if affirmed, would permit the trustee in the parent corporation's bankruptcy proceeding to attack certain transfers made by a third party to the subsidiary as voidable preferences. The circuit court, after carefully considering the policies of the Bankruptcy Code (namely, discouraging the race to the courthouse to dismember the debtor during its slide into bankruptcy, and facilitating equality of distribution of assets), determined that a court should only enter a consolidation order *nunc pro tunc* when it is satisfied:

that the use of *nunc pro tunc* yields benefits greater than the harm it inflicts. This inquiry will closely parallel that conducted with respect to consolidation. Because the consolidation proceeding will already have established a substantial identity between the entities to be consolidated, this inquiry begins with the proponent of *nunc pro tunc* making a showing that *nunc pro tunc* is necessary to achieve some benefit or avoid some harm. Following this showing, a potential preference holder may challenge the *nunc pro tunc* entry of the consolidation order by establishing that it relied on the separate credit of one of the entities to be consolidated and that it will be harmed by the shift in filing dates. If a potential preference holder meets this burden, the court must then determine whether the benefits of *nunc pro tunc* outweigh its detriments.

810 F.2d at 277 (footnote omitted). The *Auto–Train* court reconciled its ruling with *Evans Temple Church of God in Christ and Community Center v. Carnegie Body Shop Co. (In re Evans Temple Church of God in Christ and Community Center),* 55 B.R. 976 (Bankr.N.D.Ohio 1986). It noted that the creditor's inability to distinguish between the consolidated debtors in *Evans Temple* was not inconsistent with

the test it formulated, namely the extent of the creditor's reliance on the apparent separateness of the parent and its subsidiary, regardless of the internal operation of the two entities as one. *In re Auto–Train Corp., Inc.*, 810 F.2d at 277.

■ The first question that this Court must answer is whether there is any procedural bar to the Saccurato's now raising the issue of *nunc pro tunc* consolidation in the context of this adversary proceeding or whether the issue should have been raised in conjunction with the motion for substantive consolidation at the time it was filed. This Court can find no such procedural bar in either the rules or the cases. Provided Shawmut is afforded notice and an opportunity for a hearing, which the filing of the instant adversary proceeding has done, the Creditors' Trustee is not precluded from now requesting *nunc pro tunc* application of the consolidation order through Counts I and II of his adversary complaint.

■ The real issue is whether Mars and its subsidiaries "continually maintained the appearance of separate corporations in the public eye." *Id.* at 277–78. Although Shawmut raises a number of arguments against *nunc pro tunc* consolidation, it notably fails to argue that it relied upon the appearance of separate corporations when it made loans to the Debtors. Indeed, Exhibit F to its "Affidavit of Counsel Authenticating Pages of Deposition Transcript and Other Pleadings and Documents in Support of Motion for Summary Judgment," contains a copy of Form 10Q that Mars filed with the Securities and Exchange Commission. This document reveals that Mars reported its assets and liabilities on a consolidated basis, unlike the situation in *Auto–Train*. *Id.* at 278.

Accordingly, the Court denies Shawmut's Motion for Summary Judgment in so far as it seeks judgment in its favor and against Gaynes with respect to Counts I and II of Saccurato's complaint. The Court finds that the Creditors' Trustee has made the necessary showing that consolidation of the Debtors on a *nunc pro tunc* basis will achieve benefit to the Debtors' creditors. The burden at trial shall rest upon Shaw-

mut to introduce evidence to prove that "it relied upon the separate credit of one of the entities to be consolidated and that it will be harmed by the shift in filing dates." *Id.* at 277.

### D. The Extent of Shawmut's Security Interests as of January 30, 1988

On January 30, 1988, in conjunction with the Third Amendment to the September 18, 1986 Loan Agreement, Mars and Gaynes executed identical Security Agreements in favor of the Bank and Nat West to secure the $5.1 million and $3.4 million Notes executed on that same day. The parties differ in their interpretation of the relevant documents.

Paragraph 5.01A of the Third Amendment provides in pertinent part:

5.01A. *Additional Documentation.* The obligation of the Banks to make Loans subsequent to January 30, 1988 is subject to the delivery, on or prior to that date, of the following additional documents:

(a) Assignment of the lessee's interest in leases with respect to all premises leased by the Borrower and/or the Subsidiaries with the exception of the Borrower's stores presently located in Lowell, Massachusetts, Milford, Connecticut, and East Hartford, Connecticut, and Gaynes store in Fishkill, New York, and BVO's stores located in Chicopee, Massachusetts and Enfield, Connecticut....

\* \* \* \* \* \*

(c) Security Agreements granting the Banks security interests in (i) all assets of Leasing; (ii) all equipment, furniture and fixtures and all Purchase and Sale Agreements with respect to store locations including the fixtures and/or inventory of that store and an assignment of Net Proceeds therefrom (as defined in Section 7.02(r)) of the Borrower; and (iii) all equipment, furniture and fixtures and all Purchase and Sale Agreements with respect to store locations including the fixtures and/or inventory of that store and an assignment of Net Proceeds therefrom (as

defined in Section 7.02(r)) of Gaynes....

The January 30, 1988 Security Agreements themselves, which parenthetically are each captioned *"SECURITY AGREEMENT,"* provide the following:

1-1. To secure the Borrower's Liabilities to the Bank, the Borrower grants a continuing security interest and assigns to the Bank, the following, now owned or hereafter acquired, and all products and proceeds thereof (hereinafter, the "Collateral"):

(a) All Equipment (as defined below), whether now owned or in which the Borrower has an interest, or hereafter at anytime acquires, or in which the Borrower obtains an interest;

(b) All purchase and sale agreements for the sale, transfer or disposition of store locations, fixtures and/or inventory.

1-2. The within grant is in addition to any security interest granted by the Borrower to the Bank and shall continue in full force and effect applicable to all Liabilities until the within Agreement is specifically terminated in writing by a duly authorized officer of the Bank.

1.3. The proceeds in which the Bank has been granted a security interest includes insurance proceeds in each type of property described in Section 1-1, above.

1.4. The Borrower shall execute all instruments required by the Bank to perfect the security interests granted herein. A carbon, photographic, or other reproduction of the within Agreement or of any financing statement or other instrument executed pursuant to this Section 1-4 shall be sufficient for filing to perfect the security interests granted herein.

In contrast to these provisions, the Fifth Amendment, which was executed on November 23, 1988, required the following additional documentation:

(a) Security Agreement granting the Banks a security interest in all inventory of the Borrower and such financing statements as the Agent may reasonably request to perfect the security interest created thereby.

(b) Security Agreement granting the Banks a security interest in all inventory of Gaynes and such financing statements as the Agent may reasonably request to perfect the security interest created thereby.

The security interests created by the Security Agreements described in (a) an (b), above, secure (x) all Liabilities (as defined therein) of the Borrower in excess of Seven Million Dollars ($7,000,000.00) and (y) with respect to the inventory of each store, the obligations of the Borrower and Gaynes to pay over to the Agent, and/or the right of the Agent to receive, the Net Proceeds of the sale or disposition of that store. Such security interests shall be terminated in whole or in part, as applicable, upon the satisfaction of the Liabilities which are so secured thereby.

The November 23, 1988 Security Agreements provide in relevant part:

1-1. To secure the Borrowers' Liabilities to the Bank, the Borrower grants a continuing security interest and assigns to the Bank the following, now owned or hereafter acquired, and all products and proceeds thereof (hereinafter, the "Collateral"):

All Inventory (as defined below), whether now owned or in which the Borrower has an interest, or hereafter at anytime acquires, or in which the Borrower obtains an interest.

1-2. The within grant is in addition to any security interest granted by the Borrower to the Bank and shall continue in full force and effect applicable to all Liabilities until the within Agreement is specifically terminated in writing by a duly authorized officer of the Bank.

1-3. The proceeds in which the Bank has been granted a security interest includes insurance proceeds in each type of property described in Section 1-1, above.

1-4. The Borrower shall execute all instruments required by the Bank to perfect the security interests granted herein. A carbon, photographic, or other re-

production of the within Agreement or of any financing statement or other instrument executed pursuant to this Section 1–4 shall be sufficient for filing to perfect the security interests granted herein.

Shawmut argues that it had a valid perfected security interest in the inventory and fixtures of Mars and Gaynes as of January 30, 1988. In its view, which is set forth in the affidavit of Murray Viehl, a Shawmut Vice President, the Third Amendment merely restricted the Bank's right to realize upon its collateral until such time as a purchase and sale agreement was signed.

The Creditors' Trustee maintains that the Security Agreements only provided Shawmut with a security interest in the proceeds from the sale of store locations, including proceeds attributable to fixtures and inventory. He maintains that the Security Agreement reflects the Debtors' and Shawmut's knowledge that Mars intended to close and liquidate a number of stores. Further, he asserts that if the parties had intended to grant Shawmut a security interest in inventory, the security agreement would have so provided. The Creditors' Trustee points to the November 23, 1988 security agreement as evidence that Shawmut was aware that its January 1988 security interests did not include a general security interest in all inventory.

■ A recent case from this district contains the following summary of the law pertinent to security agreements:

The nature, extent, and validity of [the secured party's] interest in the Debtors' assets must be determined in accordance with state law. *Butner v. United States,* 440 U.S. 48 [99 S.Ct. 914, 59 L.Ed.2d 136] (1979). Under Massachusetts law, the creation of a security interest requires a security agreement that describes the collateral. M.G.L. c. 106, § 9–203(1).... There is no requirement that the agreement be entitled security agreement to be enforceable as long as it evidences an intent to create a security interest. *In re Sportsland, Inc.,* 17 U.C.C.Rep.Serv. 1333 (Bankr.D.Mass. 1975). Indeed, the security agreement

may consist of several documents. *Baystate Drywall, Inc. v. Chicopee Savings Bank,* 395 [385] Mass. 17, 429 N.E.2d 1138 (1982). The description is sufficient if it "reasonably identifies what is described." M.G.L. c. 106, § 9–110.

*In re Levitz Insurance Company, Inc.,* 152 B.R. 693, 697 (Bankr.D.Mass.1992). Moreover, as one commentator has noted, "[a] failure to list any collateral is, of course, fatal, and the parol evidence rule will prohibit adding neglected items, even if the items were included in all other loan documents." William C. Hillman, *Documenting Secured Transactions* 17–1–2 (5th ed. 1992) (footnotes omitted).

■ With these precepts in mind, the Court is unable to accept Shawmut's contention that Mars and Gaynes granted it a security interest in all their inventory through the January 30, 1988 loan documents. The language employed by the parties is unambiguous. The intention of the parties as set forth in the Third Amendment and the Security Agreements themselves is consistent: the security interest was to be in Purchase and Sale Agreements that included the sale of inventory, *not* inventory in all stores. Accordingly, parol evidence of a contrary intention in unavailing. The Court cannot accept the affidavit of Murray Viehl to the extent that its contents contradict the express terms of the Third Amendment and the Security Agreements executed on January 30, 1988.

Thus, the Court must deny Shawmut's motion for summary judgment to the extent that it seeks a declaration that it had a security interest in all inventory of Mars and Gaynes. Accordingly, the preference counts that may have been foreclosed by a contrary ruling remain viable. Since the Bank did not have a security interest in all assets on January 30, 1988, it would not have been a fully secured creditor at the time the petitions were filed, absent the November and December transfers. Therefore, Saccurato may be in a position to prove that Shawmut received more by way of the alleged preferential payments

than if the November and December security interests had not been granted.

### E. Solvency

Shawmut argues that Mars was solvent on November 23, 1988 and December 27, 1988. By arguing that a "going concern value and not a liquidation value is the proper method of valuation and by referring to Mars' November and December balance sheets, it maintains that it has rebutted the presumption of insolvency set forth in 11 U.S.C. § 547(f). Shawmut then argues that the Creditors' Trustee is unable to make a showing sufficient to establish solvency because the affidavit of Joseph D. Cronin of BDO Seidman, which the Creditors' Trustee seeks to use in opposition to the summary judgment motion, should be stricken because of a failure to adhere to a discovery agreement entered into between the parties.

■ Turning to Shawmut's pending motion to strike the Creditors' Trustee's supplemental responses to interrogatories and its motion to strike the affidavit of Joseph D. Cronin, the Court notes that the motions are predicated upon Saccurato's alleged failure to abide by an agreement set forth in a "Joint Motion to Extend Discovery Deadline." In that motion, the parties agreed that by July 3, 1992 they would file supplemental answers to interrogatories "disclosing the name, address, qualifications, opinions and basis for expert testimony of all experts." They also agreed that "[f]ailure to provide the foregoing information by July 3, 1992 shall bar the use of the expert at the time of trial." The Court approved the joint motion. In his supplemental responses to a number of interrogatories, the Creditors' Trustee indicated that his expert was in the process of preparing a report that would quantify the insolvency of the Debtors and that he would produce it when it was completed.

The Court denies Shawmut's motions for three reasons: 1) there is no indication that Shawmut complied with Local Rule 26(D)(1), requiring the moving party to arrange a meeting to attempt to eliminate discovery disputes; 2) the Creditors' Trustee's responses were not so inadequate as to warrant the sanctions requested; and 3) there is no harm to Shawmut from any delay engendered by Saccurato's need to further supplement his responses.

■ Given the denial of the discovery motions, a determination of solvency or insolvency involves disputed issues of fact. Indeed, in their Joint Pretrial Statement, the parties stipulated that the issue of Mars' solvency on November 23, 1988 and December 27, 1988 was in dispute. Accordingly, the Court denies Shawmut's motion for summary judgment with respect to Counts I and II.

### E. Ordinary Course Defense

Shawmut's motion for summary judgment with respect to this issue is wholly lacking in merit. In their Joint Pretrial Statement, the parties agree that a ruling on the issue involves contested material facts. Moreover, from the affidavits and briefs, it is clear that the parties draw divergent conclusions from Mars' financial situation and the actions Mars took in response to that situation. Accordingly, the Court denies Shawmut's motion for summary judgment with respect to Counts I and II.

### F. Whether the Granting of Security Interests to Secure

Antecedent Debt Constitutes Reasonably Equivalent Value or Fair Consideration

With respect to Count III of the Creditors' Trustee's Complaint, section 548 of the Bankruptcy Code provides in pertinent part:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily ...

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obli-

gation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a). Section 548(d)(2) defines value. That section states: " 'value' means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the Debtor." 11 U.S.C. § 548(d)(2)(A).

Similarly, with respect to Count IV, sections 4 and 6 of the UFCA provide the following:

§ 4. Conveyances by insolvent

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Mass.Gen.Laws Ann. Ch. 109A, § 4.

§ 6. Conveyances by person about to incur debts beyond ability to pay

Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature is fraudulent as to both present and future creditors.

*Id.* at § 6. Section 3 defines fair consideration, It provides in pertinent part:

Fair consideration is given for property or obligation—

(a) When in exchange for such property or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

(b) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained. . . .

*Id.* at § 3.

Shawmut argues that, assuming no security interests were granted in January of 1988, the granting of a security interest in November and December of that year for antecedent debt constituted reasonably equivalent value for purposes of 11 U.S.C. § 548 and fair consideration for purposes of sections 4 and 6 of the UFCA.

Shawmut makes few points with respect to its argument that the transfers of security interests cannot be avoided because they secured an antecedent obligation of the Debtors to Shawmut. Shawmut merely notes that the Creditors' Trustee has the burden of proof on the issue. Additionally, it relies on the language of the state and federal statutes.

The Creditors' Trustee argues that the value of the antecedent debt was far less than the value of the security interest. Specifically, he argues that there is a genuine issue as to the value of the Bank's unsecured debt. Citing *In re Morris Communications, Inc.*, 914 F.2d 458 (4th Cir.), *reh'g en banc denied* (4th Cir.1990), for the proposition that fair market value is an important factor in determining reasonable equivalence, he compares the Debtors' unsecured notes held by Shawmut to the bonds of an over leveraged or financially troubled company that must be discounted. Thus, in Saccurato's words, "[i]f the Bank had tried to market an $8 million unsecured note of Mars, an insolvent corporation, there is little doubt that the Bank would receive substantially less than the face value of the note." Under Saccurato's scenario, the security interest transferred, which in his view equals the face value of the note, would not be reasonably equivalent or proportionate to the value of the unsecured notes.

In the absence of agreement as to the amount of secured debt and the value of

the assets encumbered by the security interests granted in November and December of 1988, the Court cannot grant summary judgment to Shawmut on Counts III and IV. Both the Bankruptcy Code and the UFCA contemplate a comparison of the antecedent debt and value of the property transferred. Although the Court makes no ruling as to the soundness of the Creditors' Trustee's arguments in view of the admission in the Joint Pretrial Statement that fair consideration is a fact in dispute, the Court will not grant summary judgment.[8]

IV. CONCLUSION

In accordance with the foregoing, the memoranda and arguments of counsel whether or not specifically mentioned herein, the Court hereby denies Shawmut's motion for summary judgment. The foregoing shall constitutes findings of fact and rulings of law in accordance with Federal Rule of Bankruptcy Procedure 7052. An appropriate order shall issue.

---

**8.** Specifically, the Court makes no ruling with respect to Saccurato's assertions that antecedent debt is measured by the discounted value of the notes and the value of the security interests transferred is measured by the face amount of the notes, instead of the value of the collateral securing the antecedent obligations.